

FILED

Nov 23 2016, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel M. Schumm
Appellate Clinic
Robert H. McKinney School of Law
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Josh J. Minkler
United States Attorney

Danielle Kalivoda
Special Assistant
United States Attorney
Indianapolis, Indiana

I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Commitment of M.E., <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Department of Veterans Affairs, <br><br> *Appellee-Petitioner* | November 23, 2016 <br><br> Court of Appeals Case No. 27A02-1605-MH-987 <br><br> Appeal from the Grant Circuit Court <br><br> The Honorable Mark E. Spitzer, Judge <br><br> Trial Court Cause No. 27C01-9009-MH-567 |

**Baker, Judge.**

The Veterans Affairs (VA) Hospital filed a petition to involuntarily commit M.E. by way of forcible medication after M.E. was brought there by local police. The trial court issued an Order of Regular Commitment, committing M.E. to the hospital until discharged, and granted an order to medicate M.E. unless he did not substantially benefit from the medications. M.E. now appeals his involuntary commitment. Finding that M.E. did not receive appropriate notice, that his waiver was invalid, and that the VA did not carry its burden of proof with respect to the elements of dangerousness and grave disability, we reverse and remand with instructions to vacate the order of involuntary commitment.

## Facts[1]

M.E. is an army veteran who lives in Marion and has a well-established diagnosis of paranoid schizophrenia. On March 31, 2016, M.E. was brought to the VA Hospital by the police.[2]

On April 4, 2016, the Department of Veterans Affairs Northern Indiana Health Care System (NIHCS) filed an Application for Emergency Detention of M.E.

---

[1] We heard oral argument on October 27, 2016, at Lawrence North High School. We would like to thank the school's administration, faculty, and students for their hospitality, and Lawrence North senior Bailey Hogan for serving as our bailiff. We also thank counsel for their informative and engaging oral advocacy and subsequent discussion with the students.

[2] The record does not reveal the initial reason law enforcement became involved with M.E.

with the trial court. That same day, the trial court approved the emergency detention.

[4] On April 6, 2016, the NIHCS filed multiple documents with the trial court, including a Petition for Regular Commitment with a Physician's Statement attached. The VA did not serve these documents on M.E. or his counsel. Dr. Masood Khan completed the Physician's Statement preprinted form, indicating that M.E. was in need of custody, care, or treatment in an appropriate facility; that commitment would not be necessary if M.E. was taking medication for his condition; and that M.E. cannot be relied upon to take medication as prescribed. On April 7, 2016, the trial court issued a Commitment Hearing Order, scheduling a hearing for April 12, 2016, a Notice of Rights and Procedures, and a Mental Illness Summons. The Sheriff was ordered to serve these documents on M.E. Also on April 7, 2016, M.E., who was still being involuntarily detained at the hospital, signed a Waiver of Right to be Present at Commitment Hearing. The waiver provided:

[5] I waive my right to be present at the hearing set for 1:30 O'clock p.m. on 4/12/2016. I understand that, if I fail to appear at the hearing, I lose this opportunity to contest my commitment unless my representative contests the matter on my behalf. I wish to be represented by: _____ at the hearing. This waiver is given voluntarily. No person has encouraged or pressured me to sign this waiver.

Appellant's App. Vol. 2 p. 26.

[6] M.E.'s counsel learned of the proceedings on April 8 when counsel for the VA called him. M.E.'s counsel had to ask for all of the documents to be sent to him. After speaking with M.E., M.E.'s counsel filed a motion to continue the hearing. His request was granted, and on April 20, 2016, the hearing took place. Meanwhile, on April 12, 2016, M.E. was discharged from the VA hospital.

[7] At the hearing, Dr. Masood Khan, a staff inpatient psychiatrist at the hospital, was the VA's sole witness. Dr. Khan testified that when M.E. arrived at the acute mental health unit, M.E. was swearing loudly, presenting with disorganized thoughts and behavior, acting paranoid, and initially refusing medications. According to Dr. Khan, the commitment order was necessary because "the long history of non-compliance, is primary [sic] the issue, that's why the order is being questioned." Tr. p. 6. Dr. Khan testified that schizophrenia is categorized by delusions and hallucinations, and that when M.E. is in his delusional state, he thinks that people are discriminating against him because he is Black; when he is hallucinating, he responds loudly to unseen others and makes physical gestures. When asked to explain the nature of M.E.'s yelling or purported threats, Dr. Khan testified that M.E. yelled, "these white bitches get away from me. You did this to me, you did that to me." *Id.* at 15. Dr. Khan testified that M.E. has a long history of marijuana use, which will, in some cases, exacerbate schizophrenia.

[8] Dr. Khan further testified that prior to the instant admission, M.E. had been admitted to the acute mental health unit of the VA Hospital in Marion at least

thirty-one times. He testified that when M.E. was part of the VA program for mental health intensive case management, he was compliant with his medication and was free of symptoms. Dr. Khan said that "[t]here has been no physical [aggression] from what I am remembering from the records," *id.* at 10, and that the most recent time that M.E. was restrained was July 2013. Dr. Khan testified that although M.E. showed up for his appointment on April 19, 2016, he declined the medication. Dr. Khan recommended a treatment plan that was a long-acting injectable. He testified that M.E. is an ideal candidate for this medication because he does not exhibit side effects from it and his "presentation turns around 180 degrees." *Id.* at 12.

[9] M.E. testified on his own behalf. He testified that he did not know why he was taken to the hospital: "I got out there and they wouldn't tell me, they never told me anything. To this day I still don't know what was said that I did to except for what" he was told by counsel. *Id.* at 19. He stated that he wears an allergy bracelet for the medication that he was forced to take, and that he suffers side effects from it, including kidney and bladder problems. He testified that he lives by himself in an apartment, pays rent for his apartment every month, eats regularly, and dresses himself. He gets along well with his landlord. He said that he gets loud sometimes because "my voice does accelerate." *Id.* at 20. He testified that one white patient "swore up and down and he went home" and another "threw his tray on the floor" and would probably go home. *Id.* at 21. As for his delusions, M.E. said that white people do not bother him, but that if something happened, their word would overrule his.

On April 25, 2016, the trial court issued an Order of Regular Commitment, finding M.E. to be mentally ill, dangerous, and gravely disabled, and permitting him to be forcibly medicated. M.E. now appeals.

## Discussion and Decision

M.E. makes three arguments on appeal: (1) the VA failed to serve M.E. with the documents it filed with the trial court; (2) the Waiver of Right to Be Present at Commitment Hearing signed by M.E. was invalid; and (3) the involuntary civil commitment was not warranted because the VA failed to establish that M.E. exhibited a grave disability or dangerousness to self.[3]

## I. Service of Pleadings

M.E. first argues that a hospital in a civil commitment case is required to serve the patient or patient's counsel with all documents it files with a trial court, including petitions for involuntary commitment.

In civil proceedings, each party must be served with "every pleading subsequent to the original complaint." Ind. Trial Rule 5(A)(2). The rule further provides that when "a party is represented by an attorney of record, service shall be made

---

[3] Because M.E. was eventually able to obtain the documents at issue and because he appeared at his hearing, the first two issues presented are moot. We generally do not discuss moot issues; however, a moot issue "may be decided on its merits when it involves questions of great public interest that are likely to recur." *Golub v. Giles*, 814 N.E.2d 1034, 1036 n.1 (Ind. Ct. App. 2004). "The question of how persons subject to involuntary commitment are treated by our trial courts is one of great importance to society." *Id.* Further, this case involves a question of whether an individual who is involuntarily committed is able to validly waive his rights. These are issues of great public importance and are likely to recur, so we will address them.

upon such attorney unless service upon the party is ordered by the court." T.R. 5(B). Service upon the attorney or party can be made through a variety of methods, including through mail, e-mail, or fax. *Id.* Mental health proceedings are conducted like other civil proceedings according to the trial rules except as otherwise provided. Ind. Code § 12-26-1-6. An individual alleged to have a mental illness has the right to receive adequate notice of a hearing so that the individual or the individual's attorney can prepare for the hearing; to receive a copy of a petition or an order relating to the individual; to be present at a hearing relating to the individual; and to be represented by counsel. Ind. Code § 12-26-2-2. The Indiana Legislature extended these rights to the proceedings for temporary commitment and regular commitment, notice of discharge of an individual, and review of commitment, but not for emergency detentions. I.C. § 12-26-2-2(a)(1)-(4).

[14] On April 6, 2016, the VA filed a petition seeking to have M.E. involuntarily committed with an attached Physician's Statement. Although M.E.'s counsel had entered an appearance on M.E.'s behalf in March of 2015, M.E.'s counsel was not served with these documents. He received notice when the VA's counsel called him on April 8 to ask about the necessity of a commitment hearing. M.E.'s counsel had to request the documents filed by the VA; on April 11, the VA's counsel faxed the pleadings to M.E.'s counsel.

[15] M.E. argues that he was not served with any of these documents, evidenced by the fact that none contained a certificate of service, and he testified at the commitment hearing that he first learned of the allegations supporting his

emergency detention and the sought-after commitment from his counsel, despite the fact that M.E. was represented by counsel beginning in 2015 and was represented by counsel when he was involuntarily committed on March 31, 2016.

[16] The VA relies on *Cheek v. State*, in which this Court found that where "an individual appears with counsel, it is apparent that the notice was *actually* received despite the fact that a sheriff's return is not included in the trial record." 567 N.E.2d 1192, 1195-96 (Ind. Ct. App. 1991) (emphasis original).

[17] We find that M.E. was never served with the pleadings related to the commitment petition. We decline to follow *Cheek* and find instead that service and proof of service is required for all civil commitment cases. The mere fact that an individual appeared at a hearing with counsel is insufficient to prove service—indeed, the individual and his counsel may have learned of the hearing through purely serendipitous circumstances, which is precisely what occurred in the present case.

[18] For service to meet due process requirements, it must be "reasonably calculated to inform the person to be served that an action has been instituted against him, the name of the court, and the time within which he is required to respond." T.R. 4.15(F). If service "is not 'reasonably calculated to inform . . .,' the mere fact that the party [served] has actual knowledge of the suit does not satisfy due process . . . ." *Glennar Mercury-Lincoln, Inc. v. Riley*, 167 Ind. App. 144, 152, 338 N.E.2d 670, 675 (1975). Here, M.E. received notice only through his counsel;

M.E.'s counsel received notice only when the VA's counsel called him to discuss a hearing, and M.E.'s counsel then had to request that the VA send him the documents that had been filed with the trial court. Even though the VA's counsel ultimately sent M.E.'s counsel the documents, such action does not constitute effective service because it was not "reasonably calculated to inform" M.E. of the action instituted against him. *Compare to Thomison v. IK Indy, Inc.*, 658 N.E.2d 1052, 1059 (Ind. Ct. App. 2006) (finding that service was effective because the appellant-defendant conceded that the summons and complaint were delivered to her residence and she made no argument that she did not receive the complaint). Accordingly, despite the fact that M.E. appeared at the hearing with counsel, his appearance does not establish that actual service occurred.

[19] Fair notice requires that individuals who may be civilly committed and their counsel receive the petitions and documents supporting the requests for civil commitment. We find, therefore, that the VA's failure to serve these documents on M.E. and his counsel violated Trial Rule 5's requirement that each party must be served with every pleading, including and subsequent to the original complaint, and that service must be made upon an attorney of a represented party.

# II. Waiver

[20] Next, M.E. argues that the "Waiver of Right to be Present at Commitment Hearing" that the VA secured from him was invalid. We agree, finding that

any waiver presented to and signed by an individual who has been involuntarily detained, and is alleged by the VA to be mentally ill, cannot be valid.

[21] In supporting its argument that M.E.'s waiver was valid, the VA relies on the fact that the waiver involved in this case was an express, written waiver, and that M.E.'s experience with commitment orders and the mental health unit of NIHCS over the course of fifteen years indicates that M.E. understood the waiver that he signed. This argument is unfathomable.

[22] It is difficult, if not impossible, to see how an individual who is involuntarily detained under an emergency detention order by a mental health institution can be considered able to exhibit the competency required to sign a valid waiver in which he relinquishes his rights. The VA cannot argue on one hand that someone is mentally ill and on the other hand that he is competent enough to sign a legal document. In other words, an individual cannot be considered so mentally ill that an emergency detention is ordered and a petition for regular commitment is filed but, simultaneously, competent enough that any waiver he may sign is validly obtained. Either an individual is competent, or he is not.

[23] Accordingly, we hold that a waiver purporting to relinquish the rights of an involuntarily detained individual, or an individual at risk of being involuntarily committed, is not valid.

## III. Sufficiency of the Evidence

[24] M.E. argues that there was no clear and convincing evidence of dangerousness to self or grave disability that warranted his involuntary civil commitment.

In reviewing the sufficiency of the evidence to support a civil commitment, which requires clear and convincing evidence, "an appellate court will affirm if, 'considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find [the necessary elements] proven by clear and convincing evidence.'" *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015) (quoting *Bud Wolf Chevrolet, Inc. v. Robertson*, 519 N.E.2d 135, 137 (Ind.1988)).

Indiana Code section 12-26-2-5(e) provides that the petitioner in a case involving the involuntary treatment of mentally ill individuals must prove by clear and convincing evidence that 1) the individual is mentally ill and either dangerous or gravely disabled; and 2) detention or commitment of that individual is appropriate. Clear and convincing evidence requires proof that the existence of a fact is "highly probable." *Lazarus Dep't Store v. Sutherlin*, 544 N.E.2d 513, 527 (Ind. Ct. App. 1989). "There is no constitutional basis for confining a mentally ill person who is not dangerous and can live safely in freedom." *Commitment of J.B. v. Midtown Mental Health Ctr.*, 581 N.E.2d 448, 451 (Ind. Ct. App. 1991).

## A.  Evidence of Dangerousness

An individual is "dangerous" when, as a result of mental illness, the individual presents a substantial risk that he will harm himself or others. Ind. Code § 12-7-2-53. When certain conduct is alleged to be dangerous, we must consider

whether "the conduct is an instance of everyday risk-taking behavior." *Commitment of J.B.*, 581 N.E.2d at 451. Dangerousness must be shown through behavior that would not occur but for the person's mental illness. *B.M. v. Ind. Univ. Health*, 24 N.E.3d 969, 972 (Ind. Ct. App. 2015). A trial court need not wait until an individual commits a physical act before determining that the individual poses a substantial risk of harm to himself or others. *Id.* When determining future dangerousness, "the court must exercise extreme caution that it not utterly strip a person suffering from mental illness of the power to make an informed decision concerning risk-taking." *Commitment of J.B.*, 581 N.E.2d at 451.

[28] In *J.B.*, J.B. suffered from alcohol abuse, and on three occasions, became so intoxicated that her mother had to retrieve her. *Id.* at 449. On two of those occasions, J.B. entered her mother's car, but once the car was stopped at a busy intersection, J.B. jumped out and ran away through traffic; on the third occasion, J.B. did not enter her mother's car but instead flagged down and got into a car with several young men. *Id.* The court found these three instances to be the only probative evidence of J.B.'s dangerousness, and that it was undisputed that each time, J.B. was at least partly motivated by her desire to escape her mother's company. *Id.* at 452. Ultimately, the court held that "[w]hile J.B. may have made a choice that many members in our society would not think worth the risk, her conduct presents too slender a thread to support an involuntary commitment." *Id.*

[29] M.E. argues that, like in *J.B.*, the evidence is "too slender a thread" to prove by clear and convincing evidence a substantial risk that M.E. would harm himself or others. We agree. First, Dr. Khan testified that three years had passed since M.E. had required physical restraint. Second, Dr. Khan's evidence about M.E.'s dangerousness was conclusory without providing facts about how M.E. may be dangerous. Specifically, Dr. Khan testified, "[w]hen he presents, he is very intimidating, he's very loud, he's very threatening. And that creates potentially [sic] problems." Tr. p. 10. When Dr. Khan was asked whether he had heard M.E. threaten any person in any way, he replied, "I have on the unit very loudly. . . . So in the morning my nurse would have to go multiple times because there is loudly screaming and to figure out as to who is it? And they would invariably come back, well this is [M.E.] again." *Id.* at 14. When asked whether M.E. had threatened to harm another person, Dr. Khan stated that M.E. would say, "these white bitches get away from me. You did this to me, you did that to me." *Id.* at 15. Thus, the most specific evidence that Dr. Khan could provide about M.E.'s dangerousness merely amounted to unpleasant comments that M.E. made about white women. Such behavior does not constitute a substantial risk that M.E. will harm himself or others, nor does it support an involuntary commitment.

## B. Evidence of Grave Disability

[30] An individual is "gravely disabled" when, as a result of mental illness, the individual is in danger of coming to harm because he: 1) is unable to provide for his food, clothing, shelter, or other essential needs; or 2) has a substantial

impairment or an obvious deterioration of his judgment, reasoning, or behavior that results in his inability to function independently. I.C. § 12-7-2-96.

[31] Regarding the first prong that must be proven to establish grave disability, M.E. argues that he is able to provide for his food, clothing, shelter, and other essential needs, and that there is no evidence that suggests otherwise. At the hearing, Dr. Khan testified that, upon M.E.'s arrival at the hospital, his staff "did not comment on [M.E.'s] poor condition." Tr. p. 9. On cross-examination, Dr. Khan agreed that M.E. was "eating properly" in the unit, and he had no reason to believe M.E. was not eating appropriately prior to his admission. *Id.* at 14. When M.E. testified, he stated that he lives alone in an apartment for which he pays rent, that he eats regularly, and that he is able to clothe himself. *Id.* at 20.

[32] Regarding the second prong, M.E. asserts that he was functioning independently and was not at risk of coming to harm because of any impairment or deterioration of judgment or behavior. Although the VA argues that grave disability results from a person's failure to recognize his own "mental illness and to take care of yourself by coming in and getting the medication that you need," *id.* at 24, our Supreme Court explicitly stated in *T.K.* that "denial of illness and refusal to medicate, standing alone, are insufficient to establish grave disability because they do not establish, by clear and convincing evidence, that such behavior 'results in the individual's inability to function independently.'" 27 N.E.3d at 276 (quoting I.C. § 12-7-2-96). Further, we do not believe that aggression or paranoia, alone, establish an inability to function independently.

[33] We agree with M.E. that there is no clear and convincing evidence to establish a grave disability. The government did not offer any evidence that M.E. is unable to provide for his food, clothing, shelter, or other essential needs, nor did it offer evidence that M.E. suffered from a substantial impairment or obvious deterioration that affected his judgment or made him unable to function independently. In fact, the physician who completed the Physician's Statement referenced by the Petition for Regular Commitment did not even check the box to indicate that M.E. was suffering from grave disability. Appellant's App. Vol. 2 p. 19-21. Moreover, the VA's reliance on M.E.'s past behavior ignores the fact that the statutory language looks to the patient's behavior at the time of the hearings, not to his history. M.E.'s aggression, paranoia, and confrontational attitude do not establish an inability to function independently under the law.

[34] The judgment of the trial court is reversed and remanded with instructions to vacate the order of involuntary commitment.

Riley, J., and Robb, J., concur.