

FILED

Dec 13 2018, 8:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
– Appellate Division
Indianapolis, Indiana

Joel M. Schumm
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Stephen E. Reynolds
Gregory W. Pottorff
Ice Miller, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil
Commitment of A.M.,

A.M.

*Appellant-Respondent,*

v.

Community Health Network,
Inc.,

*Appellee-Petitioner.*

December 13, 2018

Court of Appeals Case No.
18A-MH-636

Appeal from the Marion Superior
Court

The Honorable Kelly M. Scanlan,
Commissioner

Trial Court Cause No.
49D08-1802-MH-7271

**Mathias, Judge.**

[1] A.M. appeals the Marion Superior Court's order of temporary involuntary commitment. A.M. raises two arguments, which we restate as:

    I.  Whether the order is defective because it was only signed by the master commissioner, and not the trial judge; and,

II.  Whether the temporary involuntary commitment was supported by clear and convincing evidence of grave disability.

We affirm.

## Facts and Procedural History

A.M. is a forty-eight-year-old woman who suffers from a schizophrenia spectrum disorder.[1] On or about February 21, 2018, A.M. was in the lobby of an Indianapolis Hampton Inn and was exhibiting disorganized behavior and thoughts. After concluding that A.M. needed medical treatment, a law enforcement officer transported her to Community North Hospital ("the Hospital").

A.M. was examined by Dr. Shilpa Puri, and on February 22, 2018, the Hospital filed an Application for Emergency Detention. The Hospital alleged that A.M. was suffering from a psychiatric disorder "which substantially disturbs her thinking, feeling or behavior and impairs her ability of function." Appellant's App. p. 12. The Hospital specifically alleged that A.M. was either dangerous to herself or others or gravely disabled "as evidenced by disorganized behavior and thoughts and paranoid delusions. [A.M.] was very disheveled and malodorous upon admission indicating that she has not been taking care of her hygiene. She has been refusing all medication and labs." *Id.*

---

[1] A.M. was previously hospitalized in 2015 for acute agitation and suicidal ideations. Tr. p. 6.

Five days later, the Hospital filed a "Report Following Emergency Detention" and alleged that A.M. was suffering from "unspecified schizophrenia spectrum and other psychotic disorder and is dangerous[.]" *Id.* at 14. The Hospital recommended that A.M. be detained pending the hearing. The accompanying physician's statement alleged that A.M. was both dangerous to herself and others and gravely disabled. Dr. Puri believed that A.M. was "in need of custody, care, or treatment in an appropriate facility," that "[o]utpatient treatment would be adequate," and "[c]ommitment would not be necessary if this person were taking medication." *Id.* at 17. Dr. Puri advised that A.M. refused to begin voluntary treatment. Therefore, the Hospital requested a temporary involuntary commitment not to exceed ninety days.

The commitment hearing was held on March 1, 2018, before Commissioner Scanlan. Dr. Puri testified that when A.M. was admitted to the Hospital, she "was jumping from topic to topic" and displayed "very disorganized behavior." Tr. p. 6.

> She would throw a bunch of food and jigsaw piece[s] all over her room. She wasn't showering, taking care of her hygiene. She was expressing grandiose delusions about her being on a neuro-science committee for Eli Lilly. Traveling to different countries for conferences. As well as paranoid delusions about the police being after her.

*Id.*

Dr. Puri examined A.M. eleven times from February 22 to March 1, 2018, including the morning of the hearing. She diagnosed A.M. with unspecified schizophrenia based on the following observations:

> [T]he patient was displaying very disorganized thoughts, jumping from topic to topic, no clear condition there. Disorganized behavior including the jigsaw puzzles and food being spread out all over her room. She would intermittently yell on the unit, for no apparent reason. She has been seen talking to her food. Been seen talking to herself, having auditory hallucinations as well as those grandiose delusions and the paranoid delusions that I mentioned earlier.

*Id.* at 7. Dr. Puri testified that A.M. lacks insight into her mental illness, which "affect[s] her ability to seek care" and take medications. *Id.* at 8. Dr. Puri stated that A.M. missed sixteen doses of her medication. *Id.* Dr. Puri does not believe that A.M. will take medication unless she is hospitalized.

Dr. Puri also testified that A.M. is not able to provide herself with food, clothing and shelter.[2] She was not aware whether A.M. had income or a place to live prior to her hospital admission, and A.M. was not employed. A.M.'s appearance is "disheveled," and she does not shower or brush her teeth. *Id.* at

---

[2] A.M. testified that she makes money from writing and she has friends and family that allow her to live with them. Tr. p. 18. She also testified that she gives herself a sponge bath but will not shower at the hospital because the water is cold. *Id.* at 19.

8–9. To the doctor's knowledge, A.M. does not have anyone who can assist her in meeting her basic needs.

[9] The following exchange occurred at the hearing concerning the extent of A.M.'s mental illness:

> Question: Does Miss M suffer a substantial impairment or an obvious deterioration of her judgment, reasoning or behavior that results in her inability to function independently?
>
> Dr. Puri: Yes.
>
> Question: And how does the unspecified schizophrenia affect her ability to function independently?
>
> Dr. Puri: [She] is unable to take care of her hygiene. She hasn't been showering; very malodorous. Unable to provide shelter for her as to my knowledge.
>
> Question: So if she were released, you . . . think that based on her behavior that she wouldn't be able to function?
>
> Dr. Puri: I don't believe so.
>
> Question: Okay. And are there any other behaviors that she's exhibited that support your opinion that you haven't mentioned?
>
> Dr. Puri: Those are the ones.
>
> Question: And based on your treatment of Miss M, is she gravely disabled?
>
> Dr. Puri: Yes.
>
> Question: Is this opinion based on her chronic mental illness?
>
> Dr. Puri: Yes.

> Question: Based on your examination, treatment and contact with Miss M. do you believe that she presents a substantial risk that she will harm herself?
>
> Dr. Puri: Yes.
>
> Question: And what is the basis for your opinion?
>
> Dr. Puri: She has been displaying disorganized thoughts and behaviors as well as auditory hallucinations. So based on that she poses a potential risk for her listening to the auditory hallucinations and potentially harming herself.

*Id.* at 9–10.

[10] Dr. Puri also testified that there is a substantial risk that A.M. will harm others based on an incident with the nursing staff at the Hospital on February 26. Specifically, A.M. was agitated because the "nursing staff told her to not bring food into her room. She started yelling and pacing the hallways. She required PRN medication[,] including Haldol and Ativan to deescalate." *Id.* at 11. Dr. Puri also stated that A.M.'s "paranoid delusions about the cops being after [her] there is some risk of her [h]arming other people." *Id.* at 12. If A.M. thinks other people are trying to harm her, she "might actually harm other people." *Id.* However, to Dr. Puri's knowledge, A.M. has never physically harmed anyone. *Id.* at 17.

[11] Finally, Dr. Puri stated that a temporary commitment was necessary for A.M.'s treatment to improve her condition because A.M. "believes that she is not suffering from any sort of psychiatric condition so she has been refusing all

medications scheduled for her." *Id.* at 12. A.M. specifically refused to take certain anti-psychotic medications that Dr. Puri recommended to her. *Id.* at 14.

[12] The trial court found that A.M. suffers from a mental illness, i.e. unspecified schizophrenia spectrum disorder, and that she is gravely disabled. Specifically, the court stated that A.M. "has not identified any income that she has or any particular place for her to stay and she is demonstrating a substantial impairment or obvious deterioration of her judgment, reasoning and behavior that has affected her ability to function independently." *Id.* at 29–30. Therefore, the court ordered an involuntary, temporary commitment until May 20, 2018, unless discharged prior.

[13] The commissioner issued the findings and signed the March 1, 2018 order involuntarily committing A.M. The trial judge did not sign the order. The trial judge issued an "approval order" on March 2 under a separate cause number approving of all of the orders entered by his commissioner on March 1, 2018. The approval order is not listed in the Chronological Case Summary ("CCS") of these proceedings.

[14] A.M. now appeals.[3]

---

[3]This court held oral argument in this case on November 19, 2018, at Hamilton Southeastern High School in Fishers, Indiana. We thank the staff, administration, and students for their gracious hospitality, and particularly extend our gratitude to Janet Chandler and Mary Armstrong. We also commend counsel for the excellence of their oral and written advocacy.

# The Unsigned Order

[15] A.M. argues that we should temporarily stay this case and remand to the trial court for further proceedings because the temporary involuntary commitment order was signed only by a commissioner and not the judge.[4] On the date the order was issued, Indiana law expressly barred Commissioner Scanlan from entering a final appealable order in this case. *See* Ind. Code § 33-23-5-8.[5] However, the Hospital argues that A.M. waived her challenge to the validity of the commitment order because she did not object to the commitment order before pursuing her appeal.

[16] "'[I]t has been the long-standing policy of [the Indiana Supreme Court] to view the authority of the officer appointed to try a case not as affecting the jurisdiction of the court' –and so 'the failure of a party to object at trial to the authority of a court officer to enter a final appealable order waives the issue for appeal.'" *In re Adoption of I.B.*, 32 N.E.3d 1164, 1173 n.6 (Ind. 2015) (quoting *Floyd v. State*, 650 N.E.2d 28, 32 (Ind. 1994)); *see also City of Indianapolis v. Hicks*,

---

[4] This has been a recurring issue in this trial court. However, in the following memorandum decisions, our court concluded that the patient waived the issue by failing to timely object that the commitment order was not signed by the trial judge. See *C.H. v. Options Behavioral Health System*, 18A-MH-638, 2018 WL 5943704 (Ind. Ct. App. Nov. 14, 2018) (three consolidated appeals), *A.L. v. St. Vincent Hosp. & Health Care Ctr.*, 18A-MH-1147, 2018 WL 4907037 (Ind. Ct. App. Oct. 10, 2018) and *D.H. v. Eskenazi Health*, 18A-MH-635, 2018 WL 4558304 (Ind. Ct. App. Sept. 19, 2018).

[5] Effective July 1, 2018, the statute was amended to remove the limitation regarding magistrates (and, thus, commissioners) from entering a final appealable order. However, Indiana Code section 33-23-5-9(a) still requires that the trial court "enter the final order" in instances such as this.

932 N.E.2d 227, 231 (Ind. Ct. App. 2010) (stating that "defects in the authority of a court officer, as opposed to the jurisdiction of the trial court itself, to enter a final order will be waived if not raised through a timely objection"), *trans. denied*. "[A]ny objection to the authority of an adjudicative officer must be raised at the first instance the irregularity occurs, or at least within such time as the tribunal is able to remedy the defect." *Hicks*, 932 N.E.2d at 231.

[17] Therefore, when a party seeks to object that a magistrate or commissioner, but not the judge, signed the final order, the party must file a motion to correct error or other similar motion before the notice of appeal is filed. However, this is inconsistent with Trial Rule 59(A) which provides that a motion to correct error is a not a prerequisite for appeal unless the party seeks to address newly discovered material evidence or a claim that a jury verdict is excessive or inadequate. The rule explicitly states that "[a]ll other issues and grounds for appeal appropriately preserved during trial may be initially addressed in the appellate brief." Ind. Trial Rule 59(A).

[18] We acknowledge this inconsistency, but we are constrained to follow precedent and conclude that A.M. waived her argument that the order is defective because it was not signed by a judge.[6] *See also In the Matter of A.M.*, 959 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2011) (concluding that A.M. waived the issue because she

---

[6] Because we conclude that the issue is waived, we decline to address the Hospital's argument that A.M.'s argument is moot because Indiana Code section 33-23-5-8 was amended effective July 1, 2018.

failed to timely object that the commitment order was signed only by the magistrate), *disapproved of on other grounds by P.B. v. Evansville State Hospital*, 90 N.E.3d 1199 (Ind. Ct. App. 2017); *but see L.J. v. Health and Hospital Corp.*, 2018 WL 5075089, Slip op. at 3 n.4 (Ind. Ct. App. Oct. 18, 2018) (declining to address the waiver argument).

## Evidence of Grave Disability

[19]　A.M. also argues that the Hospital failed to present clear and convincing evidence that she is gravely disabled.[7] In this regard, our court has previously observed that "the purpose of civil commitment proceedings is dual: to protect the public and to ensure the rights of the person whose liberty is at stake." *In re Commitment of Roberts*, 723 N.E.2d 474, 476 (Ind. Ct. App. 2000).

> The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom, and given the serious stigma and adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements. To satisfy the requirements of due process, the facts justifying an involuntary commitment must be shown by clear and convincing evidence . . . [which] not only communicates the relative importance our legal system attaches to a decision ordering an involuntary commitment, but . . . also has the function of reducing the chance of inappropriate commitments.

---

[7] A.M.'s 90-day temporary commitment has expired, but her appeal is not moot. *See M.Z. v. Clarian Health Partners*, 829 N.E.2d 634, 637 (Ind. Ct. App. 2005), *trans. denied*.

*Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015) (internal citations and quotations omitted).

[20] The Hospital was required to prove by clear and convincing evidence that A.M. is mentally ill and either dangerous or gravely disabled and that detention or commitment of A.M. is appropriate. *See* Ind. Code § 12-26-2-5(e). When we review the sufficiency of the evidence to support a civil commitment, "'an appellate court will affirm if, considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find the [necessary elements] proven by clear and convincing evidence.'" *Commitment of M.E. v. Dep't of Veterans Affairs*, 64 N.E.3d 855, 861 (Ind. Ct. App. 2016) (quoting *T.K.*, 27 N.E.3d at 273) (internal quotation omitted)), *disapproved of on other grounds by A.A. v. Eskenazi Health/Midtown CMHC*, 97 N.E.3d 606, 611 (Ind. 2018)). Clear and convincing evidence requires proof that the existence of a fact is "highly probable." *Id*. "'There is no constitutional basis for confining a mentally ill person who is not dangerous and can live safely in freedom.'" *Id*. (quoting *Commitment of J.B. v. Midtown Mental Health Ctr.*, 581 N.E.2d 448, 451 (Ind. Ct. App. 1991)).

[21] Indiana Code section 12-7-2-96 defines "gravely disabled" as:

> [A] condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:

> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
>
> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

Because this statute is written in the disjunctive, a trial court's finding of grave disability survives if we find that there was clear and convincing evidence to prove either that the individual was unable to provide for his basic needs or that her judgment, reasoning, or behavior was so impaired or deteriorated that it resulted in her inability to function independently. *Commitment of B.J. v. Eskenazi Hosp./Midtown CMHC*, 67 N.E.3d 1034, 1039 (Ind. Ct. App. 2016).

[22] It is important to recall that denial of mental illness and refusal to medicate, standing alone, are legally insufficient to establish grave disability because they do not establish by clear and convincing evidence that the individual is unable to function independently. *See T.K.*, 27 N.E.3d at 276. Moreover, since everyone exhibits some abnormal conduct at one time or another, "loss of liberty [through a commitment] calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior." *Addington v. Texas*, 441 U.S. 418, 427 (1979).

[23] A.M. concedes that she is mentally ill but argues that the Hospital failed to prove by clear and convincing evidence that she is "in danger of coming to harm" as a result of her mental illness. Appellant's Br. at 10 (citing I.C. § 12-7-

2-96). Specifically, A.M. claims that her refusal to shower is not clear and convincing evidence that she is in danger of coming to harm. A.M. also asserts that the hospital failed to prove that she is unable to provide food, clothing and shelter for herself. A.M. concedes that she "may not be functioning optimally or ideally," but "'unusual decisions' or 'certain behaviors characteristic of a person with [a mental illness]'" are not sufficient to uphold an involuntary commitment based on grave disability." *Id.* at 13 (quoting *In the Matter of the Commitment of K.F. v. St. Vincent Hosp. and Health Care Ctr.*, 909 N.E.2d 1063, 1067 (Ind. Ct. App. 2009), *disapproved on other grounds by T.K.*, 27 N.E.3d at 274).

[24] The Hospital argues that Dr. Puri's testimony is sufficient to meet the clear and convincing evidence standard. Dr. Puri testified that as a result of her mental illness, A.M. is unable to function independently. Tr. p. 9. A.M. admitted that she lacks income and lives a transient lifestyle. A.M. does not properly care for her hygiene, and she throws and talks to her food. A.M. denies her mental illness and refuses to take her medication. Importantly, although the last two factors are, standing alone, insufficient to establish grave disability, they may still be considered in determining whether A.M. is gravely disabled.

[25] A.M. attempts to analogize her case to other cases reversing temporary commitments because there was insufficient evidence to establish that the patient was gravely disabled. In *T.K.*, there was no evidence presented to dispute the patient's ability to provide food, clothing and shelter for himself because he was employed, owned two vehicles and rented his own home. 27

N.E.3d at 276. In *M.E.*, the patient was able to function independently, ate properly, lived alone in his rented apartment and was able to clothe himself, and the petitioning hospital's reliance on M.E.'s past behavior could not be utilized at the time of the commitment hearing to establish grave disability. 64 N.E.3d at 862–63. Finally, in *K.F.*, the petitioning hospital presented only the doctor's equivocal testimony concerning whether the patient was able to function independently, there was no concern about her ability to care for her basic needs, and K.F.'s husband and son testified that she could function independently. 909 N.E.2d at 1066–67.

[26] In contrast, A.M. is admittedly transient and does not have a stable income or shelter. And Dr. Puri testified that if A.M. were released from the Hospital, she would not be able to function independently. Also, and quite importantly, the Hospital was required to forcibly administer two psychotropic medications to de-escalate A.M.'s behavior while under her emergency commitment. Under these facts and circumstances, we conclude that the Hospital presented clear and convincing evidence that as a result of her mental illness, A.M. is gravely disabled because she is in danger of coming to harm from her inability to function independently.

## Conclusion

[27] Under controlling precedent, A.M. waived her claim that the temporary involuntary commitment order is defective, because she did not raise the argument in the trial court. Further, we affirm the trial court's commitment

order because we conclude that the order is supported by clear and convincing evidence of grave disability.

[28]     Affirmed.

Bradford, J., and Altice, J., concur.