## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 12 2020, 6:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel M. Schumm
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Stephen E. Reynolds
Sean T. Dewey
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil Commitment of L.S.,

*Appellant-Respondent,*

v.

Community Health Network, Inc.,

*Appellee-Petitioner*

February 12, 2020

Court of Appeals Case No.
19A-MH-1610

Appeal from the Marion Superior Court

The Honorable Melanie Kendrick, Judge Pro Tempore

Trial Court Cause No.
49D08-1906-MH-23002

**Crone, Judge.**

## Case Summary

L.S. appeals his temporary involuntary commitment. He argues that the trial court's commitment order is not supported by clear and convincing evidence that he is gravely disabled. Concluding that the evidence is sufficient, we affirm.

## Facts and Procedural History

L.S. is a sixty-eight-year-old man, a Vietnam veteran, a former police officer, and a practicing attorney. He has been practicing law for thirty-two years. He and his wife "maintain a home" that they have lived in for forty-two years. Tr. Vol. 2 at 38. L.S. has owned guns all his life. *Id*. at 24.

On June 5, 2019, L.S.'s wife P.S., in consultation with L.S.'s primary care physician, contacted police for immediate detention of L.S. L.S. was transported to Community Hospital North ("Community"), where he was admitted pursuant to an application for emergency detention. Dr. Shilpa Puri examined L.S. and filed with the trial court a "Report Following Emergency Detention" and "Physician's Statement" stating that in her professional opinion, L.S. was suffering from a psychiatric disorder, namely, "unspecified schizophrenia spectrum and other related disorder[,]" was dangerous and gravely disabled, and was in need of an involuntary commitment not to exceed ninety days. Appellant's App. Vol. 2 at 17.

On June 13, 2019, the trial court held an evidentiary hearing to determine whether L.S. is mentally ill and either dangerous or gravely disabled. To

support temporary involuntary commitment, Community presented the testimony of Dr. Jacob Mulinix, L.S.'s wife P.S., L.S.'s legal assistant K.R., and L.S.'s daughter E.A. Dr. Mulinix, a resident physician of Community, provided the following testimony. During L.S.'s emergency detention, Dr. Mulinix saw L.S. six times as part of the residency team and acted as L.S.'s "full provider" for the two days prior to the hearing. Tr. Vol. 2 at 6. Dr. Mulinix conducted his first one-on-one interview with L.S. the day before the hearing and last examined L.S. the morning of the hearing. Based on L.S.'s heightened sense of paranoia and delusions, Dr. Mulinix diagnosed L.S. with unspecified schizophrenia spectrum or other psychotic disorder. *Id.* at 7. L.S. believes that the FBI wants to kill him and that "the entire hospitalization is the result of (inaudible) by the federal government that has trickled down to the state government law enforcement." *Id.* at 8. L.S. also believes that he is playing a part in a "script" and "goes through this set of events yearly … or recurrently in order to be testified for memory and cognitive ability based on the federal government accidentally overdosing him on medications in the past." *Id.* Additionally, L.S. believes that "there is a group that is going around Johnson County that is targeting veterans and trying to strip them from their arms and so he is having to (inaudible) his firearms and get them to a safe place." *Id.* L.S. has no insight into his mental illness, his lack of insight affects his ability to seek care and take medication, and L.S. is suffering a substantial impairment or obvious deterioration of his judgment, reasoning or behavior that results in his inability to function independently. *Id.* at 8-9.

[5]     When asked how L.S.'s medical condition affected his ability to function independently, Dr. Mulinix answered as follows:

> In his case it is different than most patients because [L.S.] has such a higher level of education. He is extremely intelligent and has a high premorbid intellectual functioning that in his case, his ability to function independently are [sic] measured more relative. He is not going to be able to perform at his job as a high functioning lawyer and also his role as a family member (inaudible) could also be in jeopardy due to being consumed by these delusions and a hyper-paranoid state. As well as having access to firearms[.]

*Id.* at 9. Dr. Mulinix also opined that L.S. was in danger of coming to harm because of his inability to function independently. Specifically, Dr. Mulinix testified that

> [L.S.] is in danger of coming to harm because … in his paranoid state he … is more paranoid than normal and hypervigilant with his history of PTSD and he may mistake threats or he may mistake something as a threat that is really not and that could lead him to harm.

*Id.* at 10. While at Community, L.S. was given a low dose of medication that would be slowly increased, but even the low dose helped L.S. in that he was no longer focusing exclusively on his delusions like he had when he was first admitted. *Id.* at 13-14. L.S. could not be relied upon to take his medication without supervision.

[6]     P.S. testified that she was scared for L.S. and that he needs help. She explained that L.S.'s paranoia and delusions first appeared about six months prior to the

hearing and had progressively worsened. *Id.* at 25. L.S. "is afraid the government is going to take something from us" and believes that spies are driving cars down their street, and when the phone company put flags in their yard, L.S. "kept insisting they were tapping into their phone." *Id.* at 22. In mid-May 2019, L.S. was up all night going in and out of the house with his guns, moving his guns, and telling P.S. that they needed to go to McDonald's, that that was their "plan." *Id.* at 20-21. Also that night, L.S. had "two really bad episodes of crying and going on and on about things that did not happen but he believed happened." *Id.* at 20. L.S. "constantly [says] things that are not true that he thinks are true." *Id.* at 23. According to P.S., L.S. has always been a loving husband, but he is not like that anymore, and L.S. did not "really seem to think [she was] even around." *Id.* at 22. P.S. further testified, "[L.S.] is someone I do not know. He does not know what is reality. He thinks all of this is true. That they have erased my memory and he is the only one that knows what is going on. It is everybody else that is wrong." *Id.* at 23. P.S. believed that L.S.'s paranoia and delusions have made it "impossible for him to function normally as he normally would." *Id.* at 25.

[7] K.R. testified that she had been L.S.'s legal assistant for three years, had previously worked for L.S., and had known him since 1999. At the office, L.S. thinks that he is being watched, walks around looking for cameras, and says that if he does not do certain things, "it is a trigger." *Id.* at 29. L.S. tells her things that have never happened. For example, L.S. told her that she should remember when an FBI agent was at the office and that L.S. had worn an ankle

bracelet, but neither of those things had happened. *Id.* Recently L.S.'s delusions had expanded to include his clients. *Id.* at 27.

[8] E.A. testified regarding her encounter with her father when she and her mother visited him in the hospital:

> [L.S.] started acting very aggressively. … He was saying, "Do you not trust me? Do you not believe me? You know, the government is after me. The courts are after me. There is poison in the pills." My mom asked him, "Are you going to – we have to continue this. We have to get better." We – you know – he goes I am not going to take this medication anymore. It is poison. I am only taking it because they are forcing me to. He said he would not see a psychiatrist or seek help.

*Id.* at 33. E.A. also testified that the thoughts and behaviors stemming from L.S.'s mental illness affected his ability to function independently because in his paranoid state L.S. "gets more agitated[,]" and all he can focus on is his delusions, which consume him. *Id.* at 34.

[9] L.S. testified that he did not need to be temporarily committed. The trial court asked L.S. whether he felt that he is in harm's way or that there is a threat of harm coming to him from anybody, and L.S. responded,

> Well, I am – I am not sure. And I will tell you because some of this stuff has been contracted out. Once the – the FBI they start something then they filter it down so they do not always have agents for every position. They will contract it out to certain – certain security companies to do things. And then they have what they call 'practices'. To see if they can – and because there is a scenario already in place, they will use it again in order to test the

quality of the security company to keep them in good standing with the FBI so when they need a new – they have a new project they can look to these people for that kind of work. And so they practice that. The difficulty is that when they practice that, it does raise concern because in the past, I have been the object of attempts to take my life. By rogue law enforcement members.

*Id*. at 48.

[10] At the conclusion of the hearing, the trial court entered a temporary commitment order, finding that Community had proven by clear and convincing evidence that L.S. was "suffering from a psychiatric disorder, unspecified schizophrenia spectrum and other related disorder, which is a mental illness," was gravely disabled, and was in need of custody, care, and treatment at Community for a period not to exceed ninety days. Appealed Order at 1-2. Although Community had also alleged that L.S. was dangerous, the trial court did not make a finding regarding that allegation. This appeal ensued.

## Discussion and Decision

[11] L.S. argues that the evidence is insufficient to support his temporary involuntary commitment. As a preliminary matter, we observe that L.S.'s appeal is arguably moot because ninety days have elapsed since the trial court issued its order and L.S. has likely been released from his involuntary commitment. "When a court is unable to render effective relief to a party, the case is deemed moot and usually dismissed." *In re Commitment of J.M.*, 62 N.E.3d 1208, 1210 (Ind. Ct. App. 2016) (quoting *In re J.B.*, 766 N.E.2d 795, 798

(Ind. Ct. App. 2002)). However, "Indiana recognizes a public interest exception to the mootness doctrine, which may be invoked when the issue involves a question of great public importance which is likely to recur." *T.W. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 121 N.E.3d 1039, 1042 (Ind. 2019) (quoting *Matter of Tina T.*, 579 N.E.2d 48, 54 (Ind. 1991)). "[A]n involuntary commitment is of great public interest and involves issues which are likely to recur, so we generally choose to address the merits of such appeals, despite the mootness of the case." *B.D. v. Indiana Univ. Health Bloomington Hosp.*, 121 N.E.3d 1044, 1048 (Ind. Ct. App. 2019).

[12] Civil commitment proceedings have two purposes: to protect the public and to ensure the rights of the person whose liberty is at stake. *P.B. v. Evansville State Hosp.*, 90 N.E.3d 1199, 1202 (Ind. Ct. App. 2017). "[S]ince everyone exhibits some abnormal conduct at one time or another, loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior." *T.D. v. Eskenazi Health Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 511 (Ind. Ct. App. 2015) (quoting *In re Commitment of G.M.*, 743 N.E.2d 1148, 1151 (Ind. Ct. App. 2001)). "Given the liberty interest at stake, the serious stigma involved, and the adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements." *B.D.*, 121 N.E.3d at 1049. To satisfy due process requirements, the petitioner is required to prove the facts justifying involuntary commitment by clear and convincing evidence. *Id.*

[13] "Clear and convincing evidence requires proof that the existence of a fact is 'highly probable.'" *Matter of Commitment of C.N.*, 116 N.E.3d 544, 547 (Ind. Ct. App. 2019) (quoting *Commitment of M.E. v. Dep't of Veteran's Affairs*, 64 N.E.3d 855, 861 (Ind. Ct. App. 2016)). Requiring this standard of proof reflects "the relative importance our legal system attaches to a decision ordering an involuntary commitment" and reduces the "chance of inappropriate involuntary commitments." *Civil Commitment of J.B. v. Cmty. Hosp. N.*, 88 N.E.3d 792, 795 (Ind. Ct. App. 2017). When we review the sufficiency of the evidence supporting an involuntary civil commitment, we will affirm if, "considering only the probative evidence and reasonable inferences supporting the decision, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find the necessary elements proven by clear and convincing evidence." *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015) (quoting *Bud Wolf Chevrolet, Inc. v. Robertson*, 519 N.E.2d 135, 137 (Ind. 1988)).

[14] In Indiana, a court may order a temporary commitment of not more than ninety days for an individual who is mentally ill and either dangerous or gravely disabled. Ind. Code § 12-26-6-1. "There is no constitutional basis for confining a mentally ill person who is not dangerous and can live safely in freedom." *C.N.*, 116 N.E.3d at 547 (quoting *M.E.*, 64 N.E.3d at 861).

[15] L.S. does not challenge the trial court's finding that he suffers from mental illness. *See* Ind. Code § 12-7-2-130 (defining mental illness as a psychiatric disorder that substantially disturbs an individual's thinking, feeling, or behavior

and impairs the individual's ability to function). Instead, L.S. contends that Community failed to present sufficient evidence to support the trial court's finding that he is gravely disabled. "Gravely disabled" is defined as

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
>
> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

Ind. Code § 12-7-2-96. There seems to be no dispute that L.S. is able to provide for his food, clothing, shelter, or other essential human needs, and therefore we turn our consideration to whether Community presented clear and convincing evidence that L.S., as a result of mental illness, is in danger of coming to harm because he has a substantial impairment or an obvious deterioration of judgment, reasoning, or behavior that results in his inability to function independently.

[16] L.S. likens his case to *T.K.*, 27 N.E.3d 271, in which our supreme court concluded that the evidence was insufficient to support the trial court's finding that T.K. was gravely disabled. T.K. suffered from paranoid schizophrenia and paranoid personality disorder and had a previous history of hospitalization. He had been living on his own for six months when he was admitted to a hospital on an emergency detention after he put flyers on car windshields that detailed

the sex offender criminal history of his ex-wife's husband and went into a clinic and started to scream at the staff. The Department of Veterans Affairs sought an involuntary regular commitment for T.K. At T.K.'s commitment hearing, the only evidence presented by the Department was the testimony of Dr. Joseph Bishara. Dr. Bishara testified that T.K. believed that a wide range of institutions were persecuting him. T.K. was also skeptical of the medical establishment and believed that people were diagnosed with mental disorders for the purpose of making money, and therefore he often did not comply with taking medication. Dr. Bishara also testified that T.K. was aggressive and disruptive at the hospital and other patients were fearful of him. T.K. was estranged from all family support, but his son had communicated with Dr. Bishara to express concern that T.K. was an ex-Marine who had knowledge of weapons and had mentioned the use of violence in emails and on Facebook. Dr. Bishara opined that T.K. was gravely disabled "because he has continuously refused treatment, has denied that he has any problem, and has been an aggressor in several areas of his life." *Id*. at 275. T.K. testified that he had been working in his current job for five months, received disability payments for injuries he had sustained while in military service, maintained a clean home that he had been renting for six months, owned three vehicles, went to the gym every morning, did his own laundry, and had not taken medication for his mental illnesses for the last six months. The trial court found that T.K. was both dangerous and gravely disabled, but our supreme court concluded that neither finding was supported by sufficient evidence.

[17] As for whether T.K. was gravely disabled, the court noted that "Dr. Bishara's opinion that T.K. was gravely disabled was based on T.K.'s refusal of treatment, T.K.'s denial that he had any mental illness problem, and reports that T.K. had been aggressive in several areas of his life." *Id*. at 276. The court then reasoned as follows:

> In this case, at the time of the commitment hearing in October, T.K. had not been on medication since April, and in that six months T.K. had secured full-time employment and started renting a home. We do not weigh into the efficacy of whether medication is appropriate for T.K., but the evidence in this case has not clearly and convincingly shown that T.K.'s refusal to take medication and recognize his illness constitutes grave disability by resulting in such a "substantial impairment or an obvious deterioration of [T.K.'s] judgment, reasoning, or behavior that ... [he is unable] to function independently." Ind. Code § 12-7-2-96(2). The most favorable testimony to the trial court's decision is that T.K. was aggressive, loud, talked in a coarse manner that was inappropriate, and proactively sought to shame someone by placing flyers on people's windshields. While we certainly do not condone such behavior and would like to see cooperation between T.K. and medical professionals, the evidence put forth by the Department does not clearly and convincingly support the proposition that T.K. is gravely disabled. T.K. made no physical outbursts, destroyed no property, did not put himself or others in actual danger with idiosyncratic behavior, and was not at risk of suffering a lack of food, clothing, or shelter. Instead, at best, the evidence suggests that T.K.'s loud, boisterous, and rude public behavior harmed his reputation and made others not want to be around him. That is not sufficient evidence to support a civil commitment on grounds of grave disability.

*Id*. at 277.

[18]     This case is distinguishable from *T.K.* The evidence and reasonable inferences supporting L.S.'s civil commitment order show that L.S. began expressing delusions and paranoia about six months before the commitment hearing. Tr. Vol. 2 at 25. Since then, his delusions and paranoia have become progressively worse. *Id.* By the time of the hearing, he believed that the FBI was trying to kill him, a group of people was going to take his guns from him, he was being spied on at home and at the office, and his clients were part of the plans against him. He constantly told his wife and legal assistant things that had not happened. His paranoia and delusions have become all he can focus on, and they consume him. *Id.* at 34. His paranoia and delusions have changed his behavior and personality. L.S. is no longer the loving husband he once was. *Id.* at 22. He has changed so much that he is a person that his wife does not know; he is like a stranger to her. *Id.* at 23. He stayed up all night carrying his guns in and out of the house and moving them around and crying about things that never happened. Thus, in stark contrast to *T.K.*, there is clear and convincing evidence that L.S.'s mental illness has caused a substantial impairment and obvious deterioration in his judgment, reasoning, and behavior.

[19]     Further, the evidence shows that L.S.'s paranoia and delusions have affected his ability to "function independently" because all he can focus on is his delusions, which "consumes" him. *Id.* at 34. His paranoia and delusions have made it impossible "for him to function normally as he would." *Id.* at 25. L.S. has no insight into his mental illness and will refuse to take medication to treat

it.  Without treatment for his mental illness, L.S. is "in danger of coming to harm" because "he may mistake something as a threat that is really not and that could lead him to harm."  *Id*. at 10.

[20]  Although here, as in *T.K.*, L.S. experiences paranoia, does not recognize that he is suffering from a mental illness, and is uncooperative in taking medication, that is where the similarities end.  Thus, we do not find *T.K.* controlling.[1]  We conclude that the above evidence shows, clearly and convincingly, that L.S., as a result of his mental illness, is in danger of coming to harm because he has undergone a substantial impairment or obvious deterioration of his judgment, reasoning, and behavior that has left him unable to function independently.

[21]  L.S. maintains that the trial court applied the wrong standard and that it found him gravely disabled simply because he may be unable to do his job.  He points to the trial court's phrasing of the standard at the hearing.  *See* Tr. Vol. 2 at 54 (trial court stating that it would find "[L.S.] is gravely disabled due to a substantial impairment in judgement [sic] or reasoning that is affecting his ability to function.").  L.S. also argues that Dr. Mulinix seemed to be holding L.S. to a higher standard.  *See id*. at 9 (Dr. Mulinix testifying that L.S. is extremely intelligent and "his ability to function independently are [sic]

---

[1]  L.S. also cites *Commitment of M.E. v. Department of Veterans Affairs*, 64 N.E.3d 855, 862 (Ind. Ct. App. 2016), *disapproved of on other grounds by A.A. v. Eskenazi Health/Midtown CMHC*, 97 N.E.3d 606 (Ind. 2018).  *M.E.* is also distinguishable.  In that case, another panel of this Court found insufficient evidence of grave disability where the physician's statement had not indicated that M.E. was suffering from a grave disability, and the Department of Veterans Affairs relied on M.E.'s past behavior rather than his behavior at the time of the hearing.  *Id*. at 863.

measured more relative.  He is not going to be able to perform at his job as a high functioning lawyer.").  However, we note that the trial court said it found L.S. gravely disabled based on "the testimony [as] shown today." *Id*. at 54. One statement of Dr. Mulinix does not reflect a complete picture of his testimony, and L.S.'s wife, legal assistant, and daughter also provided evidence, which cannot be ignored.  Further, in the commitment order, the trial court found that L.S. was gravely disabled "as defined in I.C. 12-7-2-96."  Appealed Order at 1. Therefore, we are unpersuaded that the trial court applied the wrong standard. *See Heiligenstein v. Matney*, 691 N.E.2d 1297, 1301 (Ind. Ct. App. 1998) ("Our determination of whether a proper legal standard was utilized is … guided by an examination of the final decision which is contained in the trial court's Judgment."); *see also A.C. v. N.J.*, 1 N.E.3d 685, 693 (Ind. Ct. App. 2013) (concluding that trial court applied the correct legal standard based on final written order).

[22]  Based on the foregoing, we affirm L.S.'s temporary involuntary commitment.

[23]  Affirmed.

May, J., and Pyle, J., concur.