

FILED

Dec 15 2017, 8:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ernest P. Galos
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Kyle Hunter
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the
Commitment of P.B.,

*Appellant,*

v.

Evansville State Hospital,

*Appellee.*

December 15, 2017

Court of Appeals Case No.
71A03-1706-MH-1362

Appeal from the St. Joseph
Superior Court

The Honorable David C.
Chapleau, Judge

Trial Court Cause No.
71D05-1103-MH-57

**Barnes, Judge.**

## Case Summary

[1]     P.B. appeals her involuntary commitment to Evansville State Hospital ("the Hospital"). We reverse.

## Issue

The sole issue before us is whether there is sufficient evidence to support the trial court's commitment order.

## Facts

P.B. has been diagnosed with schizoaffective disorder and post-traumatic stress disorder. In Indiana, P.B. has been in and out of involuntary commitments to mental hospitals since March 2011. She also has previously been hospitalized in Virginia and California. She attempted suicide on several occasions, the last time being in 2014.

P.B.'s most recent hospitalization began on December 5, 2016, when she was involuntarily committed to a hospital in South Bend. Prior to this commitment, her treating psychiatrist stated that P.B. was suffering "from symptoms of paranoia, delusions, and mood lability." App. Vol. II p. 41. She also had a recent history of threatening other residents of her apartment complex and being disruptive. She believed that her family and neighbors were breaking into her apartment at night and beating her up, and she was calling police two to three times a day making delusional claims about intruders. Generally, P.B. believed that her mother was conspiring against her, to harm her and she was extremely paranoid. P.B. had been "poorly compliant" with outpatient treatment to address her paranoia and regularly refused to take antipsychotic medication, believing it was poisonous. *Id.*

On February 13, 2017, P.B. was transferred to the Hospital, a State facility. On February 14, 2017, the trial court entered an order continuing P.B.'s regular commitment without hearing. On May 2, 2017, P.B. filed a request for review and dismissal of her commitment.

The trial court held a hearing on the matter on May 18, 2017. Dr. Boris Vatel, a psychiatrist at the Hospital, testified in favor of continuing P.B.'s commitment. He stated that P.B. had made "some progress" during her hospitalization but "I don't think that she has sufficiently improved in order to be able to manage herself independently in the community." Tr. p. 6. He further explained:

> The main concerns that we have about why she requires a longer hospitalization is not that she is suicidal. I do not believe she is dangerous to herself. I also do not believe that she is physically dangerous to other people. I do believe there is a question of grave disability that has to do with her emotional functioning and with her ability to function around other people, and also to cooperate with the necessary medical care that she requires because of her mental conditions.

*Id.* at 7. Dr. Vatel also testified that P.B. did not want to take a prescribed antipsychotic mediation because she incorrectly believed that she was allergic to it. Although she sometimes was cooperative, at other times she was very hostile toward Hospital staff and other medical providers, sometimes even screaming at them.

[7] P.B. has other health conditions, including diabetes, and she has a pacemaker. During her stay at the Hospital, she also was diagnosed as possibly having sleep apnea. Dr. Vatel considered P.B.'s diabetes to be stable but was concerned that her health could deteriorate outside of the Hospital. However, he also testified on cross-examination that he could not recall any evidence that P.B.'s physical health had ever become unstable because of her mental health. In sum, Dr. Vatel testified that P.B.'s involuntary commitment needed to be continued because "I don't think she is able to get along with other people, and we all need to be able to do that in order to function independently in the community, A; B, the extreme mood liability [sic] that she is experiencing, and C, the delusions." *Id.* at 14. Although Dr. Vatel expressed concern that P.B. was at risk of being unable to provide food, clothing, and shelter for herself, no evidence was presented that she had been unable to provide those necessities for herself in the past.

[8] At the conclusion of the hearing, the trial court ordered continuation of P.B.'s regular involuntary commitment. P.B. now appeals.

## Analysis

[9] P.B. contends there is insufficient evidence to sustain her regular involuntary commitment. In a regular involuntary commitment proceeding, the petitioner may seek to have an individual hospitalized for more than ninety days. Ind.

Code § 12-26-7-1.[1] To obtain such a commitment, the petitioner must prove by clear and convincing evidence that "(1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." I.C. § 12-26-2-5(e). The Hospital here only sought P.B.'s commitment on the basis of her being "gravely disabled." That phrase is defined by statute as:

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
>
> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

I.C. § 12-7-2-96.

[10] The purpose of civil commitment proceedings is to protect the public and to ensure the rights of the person whose liberty is at stake. *Civil Commitment of T.K. v. Dep't of Veteran Affairs*, 27 N.E.3d 271, 273 (Ind. 2015). "The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom, and given the serious stigma and adverse social consequences

---

[1] There also exist procedures for involuntary "immediate" commitments lasting up to twenty-four hours, "emergency" commitments up to seventy-two hours, or "temporary" commitments up to ninety days. *See Civil Commitment of T.K.*, 27 N.E.3d 271, 273 n.1 (Ind. 2015) (citing Ind. Code chs. 12-26-4, 12-26-5, and 12-26-6).

that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements." *Id.* Making clear and convincing evidence the burden of proof for civil commitment proceedings communicates the importance in our legal system of decisions ordering an involuntary commitment and reduces the risk of inappropriate commitments. *Id.*

[11] When reviewing the sufficiency of the evidence supporting an involuntary civil commitment, we will affirm if, after considering the probative evidence and reasonable inferences supporting the decision, a reasonable trier of fact could have found the necessary elements proven by clear and convincing evidence. *Id.* We will not reweigh evidence or judge witness credibility. *Id.*

[12] We note that, in *T.K.*, our supreme court disapproved of cases from this court applying a too-deferential standard of review, which affirmed civil commitment orders merely if a reasonable person could have drawn the conclusion that commitment was necessary, even if other reasonable conclusions were possible. *Id.* at 274 (disapproving *M.L. v. Meridian Servs., Inc.*, 956 N.E.2d 752 (Ind. Ct. App. 2011); *S.T. v. Cmty. Hosp. N.*, 930 N.E.2d 684 (Ind. Ct. App. 2010); *K.F. v. St. Vincent Hosp. & Health Care Ctr.*, 909 N.E.2d 1063 (Ind. Ct. App. 2009); *J.S. v. Ctr. for Behavioral Health*, 846 N.E.2d 1106 (Ind. Ct. App. 2006), *trans. denied*). The *T.K.* opinion did not list every case from this court that contained the disapproved language. One case it did not include, but which does contain the disapproved standard of review, was *In re Involuntary Commitment of A.M.,* 959

N.E.2d 832, 835 (Ind. Ct. App. 2011).[2] The Hospital relies heavily upon this case in arguing that P.B.'s commitment was supported by sufficient evidence. However, given that *A.M.* was decided before *T.K.* disapproved of the standard of review it employed, we give it little weight in deciding P.B.'s case. If an appellate case applied an incorrect and too-deferential standard of review, it is difficult if not impossible to assess whether that case's ultimate determination of the sufficiency of the evidence is still valid. It is clear *A.M.* was implicitly, if not expressly, disapproved of by *T.K.*

[13] The facts of *T.K.* are instructive here. The involuntarily-committed patient in that case suffered from extreme paranoid schizophrenia, believing that a wide range of institutions were persecuting and targeting him. Included in this paranoia was skepticism toward the pharmaceutical industry, psychiatrists, and hospitals, as a result of which he often did not comply with taking psychiatric medication. T.K. initially was detained at a hospital on an emergency basis after he put flyers on windshields detailing the sex offender criminal history of his ex-wife's current husband. He also had a history of yelling at or being aggressive towards medical personnel, which caused some personnel and other patients to be fearful for their safety. T.K.'s son also expressed concern over the fact that T.K. was an ex-Marine who had knowledge of weapons or explosives and that he had mentioned the use of violence in emails and on Facebook.

---

[2] *A.M.* also relied extensively upon the expressly-disapproved *S.T.* and *J.S.* cases. *A.M.*, 959 N.E.2d at 836. It also relied upon *In re Commitment of Bradbury*, 845 N.E.2d 1063 (Ind. Ct. App. 2006). *Id.* Again, although not expressly disapproved of in *T.K.*, *Bradbury* contains the standard of review of which *T.K.* disapproved.

There also was evidence presented by T.K. that he was employed, had a stable and clean residence plus three vehicles, received disability income, and regularly went to the gym and did his own laundry.

[14] Our supreme court reversed the order for T.K.'s regular involuntary commitment, finding insufficient evidence of either "dangerousness" or "grave disability." *T.K.*, 27 N.E.3d at 276-77. As for "grave disability," the court noted that there was no evidence disputing T.K.'s ability to provide food, clothing, or shelter for himself. It also held that T.K.'s refusal to acknowledge his mental illness or take recommended medication "standing alone, are insufficient to establish grave disability because they do not establish, by clear and convincing evidence, that such behavior 'results in the individual's inability to function independently.'" *Id.* at 276 (quoting I.C. §12-7-2-96(2)). The court summarized as follows:

> [T]he evidence put forth by the Department does not clearly and convincingly support the proposition that T.K. is gravely disabled. T.K. made no physical outbursts, destroyed no property, did not put himself or others in actual danger with idiosyncratic behavior, and was not at risk of suffering a lack of food, clothing, or shelter. Instead, at best, the evidence suggests that T.K.'s loud, boisterous, and rude public behavior harmed his reputation and made others not want to be around him. That is not sufficient evidence to support a civil commitment on grounds of grave disability.

*Id.* at 277.

Following *T.K.* and its clarification of the standard of review for involuntary civil commitments, this court has reversed several such commitments. In *T.D. v. Eskenazi Health Midtown Community Health Center*, 40 N.E.3d 507 (Ind. Ct. App. 2015), we reversed an involuntary commitment where there was a lack of evidence regarding the individual's ability to maintain shelter, she refused to seek treatment for her mental illness, and there was a single incident in which she intentionally flooded the hotel room where she was living in hopes that the fire department would come and help her prepare for an event. In *Commitment of M.E. v. Department of Veterans Affairs*, 64 N.E.3d 855 (Ind. Ct. App. 2016), we reversed an involuntary commitment where, again, there was a lack of evidence that the individual could not provide for his own shelter, food, clothing, and other essential needs, and again, the individual was not compliant with recommended treatment, and again, the individual suffered from paranoia, delusions, and hallucinations, and often acted aggressively and confrontational towards others, and the individual had a long history of mental health problems.

Finally, in *Commitment of B.J. v. Eskenazi Hospital*, 67 N.E.3d 1034 (Ind. Ct. App. 2016), we addressed the involuntary commitment of a paranoid and delusional individual who originally was hospitalized after making multiple death threats and rape threats to multiple people and who had attempted to choke his ex-wife. After being temporarily committed for several months, the hospital sought a regular commitment, based on the individual's threatening behavior, having twice missed treatment appointments, and his apparent denial

of having a mental illness. We held this was insufficient to support an involuntary commitment based on "grave disability," where there was no evidence the individual could not provide for his own food, shelter, clothing, and other essentials. *B.J.*, 67 N.E.3d at 1040. Although we acknowledged that threatening behavior could in another case be sufficient evidence of a grave disability, there was no evidence that the individual had destroyed property or put himself or others in actual danger after beginning treatment. *Id.* We also rejected testimony by the treating psychiatrist that the individual could deteriorate into a gravely-disabled state in the future if he did not continue treatment, holding that the statute defining "gravely disabled" was written in the present tense and it was improper to consider the individual's hypothetical state based on future contingencies. *Id.*

[17] We conclude that P.B.'s commitment was based on facts that closely resemble those found in *T.K.* and succeeding cases from this court. P.B.'s most recent hospitalization occurred because of her paranoid delusions, which caused her to believe persons were breaking into her apartment and threatening her harm, and that her mother was controlling her life. She also had frequent conflicts with her neighbors and called the police department so often—multiple times a day—that she was considered a nuisance. She often was not compliant with outpatient therapy or recommended medication. During her hospitalization, P.B. continued to display aggressive or unpleasant behavior and was resistant to being medicated, although she had improved since her initial detainment.

On the other hand, there is no evidence that P.B.'s delusions caused her to destroy property or actually cause harm to herself or any other person, or otherwise engage in any behavior that arose to the level of criminality. Likewise, there is no evidence P.B. was unable to provide herself with food, clothing, shelter, and other necessities or that she was in danger of failing to do so. It is true that P.B. did not affirmatively present evidence on this issue. However, the Hospital bore the burden of proving P.B. was "gravely disabled" and it did not present any evidence on this issue, and we will not presume that it could have. We also emphasize that, although P.B. has a history of suicide attempts, Dr. Vatel was very clear that he did not think she currently was suicidal or a threat to herself or others. Furthermore, although P.B. had some physical health issues and Dr. Vatel speculated that they could become problematic in the future if P.B. was released from the Hospital, there was no evidence that P.B.'s mental health had affected her physical health on any past occasion. This is the type of hypothetical speculation we disapproved of in *B.J.*

[19] Essentially, Dr. Vatel's recommendation in favor of P.B.'s continued involuntary commitment was based on her unpleasantness and inability to get along with other people, her paranoid delusions, and her failure to fully cooperate with treatment. None of this is untrue, and there is no doubt that P.B. suffers from severe mental illness. However, the statutory definition of "gravely disabled" is very specific, and it has not been met here. There is a lack of clear and convincing evidence that P.B. was unable to function independently or that she was in danger of not providing for her own needs. As

such, her regular involuntary commitment and resulting deprivation of liberty was not supported by sufficient evidence.

## Conclusion

[20] The trial court's order for P.B.'s regular involuntary commitment was not supported by sufficient evidence and must be reversed.

[21] Reversed.

May, J., and Bradford, J., concur.