

FILED

Mar 26 2019, 11:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

**ATTORNEY FOR APPELLANT**

Kyle K. Dugger
Bloomington, Indiana

**ATTORNEYS FOR APPELLEE**

James L. Whitlatch
Kathryn E. DeWeese
Bunger & Robertson
Bloomington, Indiana

I N  T H E

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| B. D.,<br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana University Health<br>Bloomington Hospital,<br><br>*Appellee-Petitioner.* | March 26, 2019<br><br>Court of Appeals Case No.<br>18A-MH-2672<br><br>Appeal from the Monroe Circuit<br>Court<br><br>The Honorable Stephen R. Galvin,<br>Judge<br><br>Trial Court Cause No. 53C07-<br>1810-MH-422 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, B.D., appeals the trial court's Order temporarily committing her to the care of Appellee-Petitioner, Indiana University Health, Bloomington Hospital (IU Health), for a period not to exceed ninety days.

We affirm.

# ISSUES

B.D. presents us with two issues on appeal, which we restate as:

(1) Whether the trial court's determination that B.D. was dangerous to herself was supported by clear and convincing evidence; and

(2) Whether the trial court's forced-medication order was supported by clear and convincing evidence.

# FACTS AND PROCEDURAL HISTORY

In the fall of 2018, B.D. was fifty-one years old. B.D. had attempted to commit suicide in the past by overdosing on medication. Early in September 2018, B.D. was treated at Methodist Hospital[1] for manic behavior and substance abuse. B.D. was given injections of the mood stabilizer, Abilify Maintena (Abilify). B.D. responded well to the Abilify. B.D. was released from

---

[1] The location of this hospital is not clear from the record.

Methodist Hospital with a prescription for oral Abilify, but at some point thereafter she stopped taking her medication.

[5] On October 8, 2018, B.D. called a mental-health hotline expressing suicidal ideation and claiming to have overdosed on medication. The authorities were alerted, and officers came to B.D.'s home to check on her well-being but then left. The following day, B.D. contacted the hotline again expressing suicidal ideation. Officers came to B.D.'s home and escorted her to IU Health in Bloomington, where she was held for treatment after the trial court authorized an emergency detention. When B.D. first presented for crisis-care at IU Health, she was experiencing suicidal ideation. B.D. was agitated and unwilling to cooperate with an examination. B.D. banged her head against a gurney and kicked a hole in the wall of the crisis care unit. On October 10, 2018, Dr. Gregory Sidell (Dr. Sidell) was initially unable to assess B.D. because she was screaming and refusing to talk. When Dr. Sidell was able to assess B.D., she reported having a plan to harm herself with a "[m]edication overdose." (Transcript p. 10). Dr. Sidell diagnosed B.D. with Bipolar Type 1 Disorder with psychotic features.

[6] On October 10, 2018, IU Health filed a petition seeking a temporary involuntary commitment and a forced-medication order for Abilify injections for B.D. On October 12, 2018, the trial court held a hearing on the petition. Dr. Sidell was the sole witness for IU Health. Dr. Sidell testified that on October 11, 2018, B.D. had denied having continuing thoughts of suicide but that he had been informed by a member of Positive Link, a service provider to

B.D. who she would contact for emotional support, that B.D. "would tell me and the rest of the hospital staff what she thought we wanted in order to let her go and that she still did have suicidal ideation." (Tr. p. 7). Based upon his own evaluation of B.D. and the report from Positive Link, Dr. Sidell had concluded that B.D. was a danger to herself. Although Dr. Sidell could not make an exact prediction, it was his opinion that there was "definitely a threat" that B.D. would attempt suicide. (Tr. p. 11).

[7] Concerning B.D.'s treatment plan, Dr. Sidell opined that a temporary commitment and Abilify injections were the best treatment options for B.D. Dr. Sidell recommended Abilify to stabilize B.D.'s mood so that she would not experience extreme depression or manic episodes. According to Dr. Sidell, the anger and agitation that B.D. displayed when she first arrived for treatment were hallmark characteristics of a depressive phase of her Bipolar Disorder and that her anger could increase the likelihood of "impulsive suicide action." (Tr. p. 13). Dr. Sidell confirmed that he had considered lesser-restrictive alternative treatment options, including the alternate medication, Invega Sustenna (Invega). However, Dr. Sidell had rejected Invega as a treatment option because it did not treat depression. B.D. had also requested Adderall, but Dr. Sidell considered that medication to be a poor choice for B.D., given her Bipolar Disorder diagnosis, her history of substance abuse, and its likely tendency to counteract the effects of Abilify. B.D. did not wish to take Abilify because she reported that in the past she had gained twenty pounds and experienced muscle stiffness as side effects of the medication. However, Dr.

Sidell was unable to substantiate that weight gain from B.D.'s medical records, and he felt that B.D. could address any weight gain with other medications. It was Dr. Sidell's opinion that the benefits of Abilify injections outweighed its side effects and that it would treat B.D.'s Bipolar Disorder and not just control her symptoms. Dr. Sidell foresaw discharging B.D. with a prescription for oral Abilify and felt that her prognosis was good if she continued to take her medication.

[8] After the close of evidence, the trial court found that B.D. was a danger to herself and issued its Order for a temporary commitment of B.D. not to exceed ninety days. The trial court's Order included a grant of authority to IU Health to treat B.D. with Abilify unless she did not specifically benefit from the medication. On October 19, 2018, B.D. filed a motion to reconsider, which the trial court denied on November 5, 2018.

[9] B.D. now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

### I. *Preliminary Matters*

[10] On October 12, 2018, B.D. was temporarily committed to the care of IU Health for a period not to exceed ninety days, and so the period of temporary commitment has expired. Because the span of a temporary commitment is so short, an appeal is almost always moot by the time briefing is complete. As a general rule, we dismiss controversies that are moot. *M.Z. v. Clarian Health Partners*, 829 N.E.2d 634, 637 (Ind. Ct. App. 2005), *trans. denied*. However, an

involuntary commitment is of great public interest and involves issues which are likely to recur, so we generally choose to address the merits of such appeals, despite the mootness of the case. *See*, *e.g.*, *Matter of Civil Commitment of A.M.*, 116 N.E.3d 496, 502 n.7 (Ind. Ct. App. 2018) (addressing the merits of A.M.'s challenge to her temporary involuntary commitment even though she had likely been discharged from treatment).

[11]　As another preliminary matter, we note that on February 21, 2019, B.D. filed a motion to strike portions of IU Health's Appellee's Brief pursuant to Indiana Appellate Rule 42 because she contends it contains material that is immaterial and inappropriate.[2] B.D. first requests that we strike IU Health's references to the Statement in Support of Immediate Detention completed by an officer, the Application for Emergency Detention completed by Dr. Cory Norman, the Application for Emergency Detention and Report Following Emergency Detention completed by social worker Jayme Albin, and the Physician's Statement completed by Dr. Sidell. Inasmuch as B.D. argues that IU Health improperly cited those documents because they were not made part of the October 12, 2018, hearing record, we agree. IU Health neither sought the admission of those documents at the October 12, 2018, hearing, nor did it request that the trial court take judicial notice of them. IU Health maintains that its references to the challenged documents were proper because they were

---

[2] Contemporaneous to and consistent with this Opinion, we issue an order granting in part and denying in part B.D.'s motion to strike.

filed according to statutory mandates. It also directs our attention to Indiana Code section 12-26-6-8 which provides that the trial court may consider "the record" in reaching its temporary commitment determination. However, IU Health does not direct our attention to, and we are unaware of, any portion of the civil commitment statute which relieves a petitioner from making evidence part of the hearing record in order for the trial court to consider it. Therefore, we hereby strike those portions of IU Health's brief which cite B.D.'s Appendix and relate to statements contained in those documents which were not admitted into evidence. If any facts were testified to by Dr. Sidell at the hearing were also contained in the stricken documents, we rely upon the testimony of Dr. Sidell in reaching our conclusions.

[12] B.D. also requests that we strike portions of IU Health's brief that refer to Dr. Sidell's testimony containing hearsay which she contends could not be considered as substantive evidence by the trial court. B.D. relies upon our decision in *Commitment of M.M. v. Clarian Health Partners*, 826 N.E.2d 90, 95 (Ind. Ct. App. 2005), *trans. denied*, in which we held that, in an involuntary commitment proceeding, a trial court may not consider as substantive evidence hearsay relied upon by a treating physician in reaching his professional opinion. *Id*. In that case, the treating physician testified, without personal knowledge, about events leading up to M.M.'s emergency commitment as well as events that occurred during her treatment prior to the commitment hearing. *Id*. at 94-95. However, M.M. made a detailed and timely objection to the challenged evidence at trial. *Id*. at 94. Here, B.D. raised only one hearsay objection at the

October 12, 2018, hearing. That objection was to Dr. Sidell's testimony that B.D. had denied having suicidal ideations the day before the hearing. After the trial court overruled that objection, B.D. did not object further or ask for a continuing objection to any other hearsay testimony. The failure to object at trial to the admission of such hearsay evidence results in waiver of any alleged error. *Reed v. Bethel*, 2 N.E.3d 98, 107 (Ind. Ct. App. 2014). In addition, B.D. did not raise any challenge to this evidence in her Brief of Appellant, further compounding her waiver. Instead, she has used a motion to strike and her reply brief in an attempt to circumvent the effect of her waiver. Because B.D. did not properly preserve her claim of error, we deny her motion to strike as to any hearsay contained in Dr. Sidell's testimony. We also note that any error in the admission of Dr. Sidell's testimony that B.D. had denied suicidal ideation the day before the hearing was harmless, as during her own testimony, B.D. denied that she had plans to hurt herself. *See In re S.W.*, 920 N.E.2d 783, 788 (Ind. Ct. App. 2010) (holding that the admission of evidence which is cumulative of other properly admitted evidence is harmless).

## II. *Temporary Commitment Order*

B.D. claims that insufficient evidence supported the trial court's Order temporarily committing her to the care of IU Health. The purpose of civil commitment proceedings is to protect the public and to ensure the rights of the person whose liberty is at stake. *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015). Given the liberty interest at stake, the serious stigma involved, and the adverse social consequences that accompany

such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements. *Id.* In order to protect the due process rights of a person subject to commitment, the facts justifying an involuntary commitment must be shown by clear and convincing evidence. *Id.* This standard of proof communicates the relative importance our legal system attaches to a decision ordering an involuntary commitment, and it also has the function of reducing the likelihood of inappropriate commitments. *P.B. v. Evansville State Hosp.*, 90 N.E.3d 1199, 1202 (Ind. Ct. App. 2017). When we review the sufficiency of the evidence supporting an involuntary civil commitment, we will affirm if, after considering the probative evidence and reasonable inferences supporting the decision, a reasonable trier of fact could have found the necessary elements proven by clear and convincing evidence. *Id.* We do not reweigh the evidence, nor do we judge witness credibility. *Id.*

[14] In Indiana "[a]n individual who is alleged to be mentally ill and either dangerous or gravely disabled may be committed to a facility for not more than ninety (90) days." Ind. Code § 12-26-6-1. B.D. does not challenge the trial court's finding that she is mentally ill, and the trial court did not conclude that B.D. was gravely disabled. Rather, B.D. contends that IU Health did not show by clear and convincing evidence that she was a danger to herself. For purposes of civil commitment, dangerousness is defined as "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm [herself] or others." I.C. § 12-7-2-53. Dangerousness must be shown through behavior that would not occur but for the putative

committee's mental illness. *B.M. v. Ind. Univ. Health*, 24 N.E.3d 969, 972 (Ind. Ct. App. 2015), *trans. denied*. A trial court's decision that a person is a danger to herself may be partially based upon the person's threat to harm herself. *See C.J. v. Health and Hosp. Corp. of Marion Cty.*, 842 N.E.2d 407, 410 (Ind. Ct. App. 2006) (upholding a commitment where the trial court found C.J. dangerous to himself or other based, in part, on C.J.'s threat to kill his family and himself).[3]

[15] Here, the evidence at B.D.'s commitment hearing showed that B.D. has Bipolar Type 1 Disorder with psychotic features. B.D. had attempted suicide through medication overdose in the past, and, a mere one month or so prior to the events that led to the instant commitment, she had been treated for mania and substance abuse at Methodist Hospital. B.D. had stopped taking the oral Abilify she had been prescribed upon discharge from Methodist Hospital. Beginning on October 8, 2018, B.D. contacted a mental-health hotline two days in a row reporting that she was contemplating suicide and had overdosed on medication. After the second instance, B.D. was escorted to IU Health for treatment. There, she reported suicidal ideation and told Dr. Sidell that she had a plan to harm herself with medication. B.D. banged her head on a gurney and kicked a hole in the wall of the crisis-care unit. One day prior to the commitment hearing, B.D. reported to Dr. Sidell that she no longer experienced suicidal ideation, but she told Positive Link otherwise. It was Dr. Sidell's

---

[3] We are aware that in *C.J.* we applied a standard of review which was expressly disapproved of by our supreme court in *T.K.* However, the application of an inappropriate standard of review did not render the factors considered in *C.J.* invalid.

opinion that B.D.'s anger and agitation were hallmarks of her Bipolar Disorder that increased her suicide risk, B.D. posed a danger to herself, and that there was "definitely a threat" that B.D. would attempt to commit suicide. (Tr. p. 11). Given B.D.'s history of attempted suicide, her failure to take her mood stabilizing medication, her repeated reports of suicidal ideation and overdose to the hotline, her physically aggressive behavior at IU Health, her reports to Dr. Sidell of suicidal ideation and a plan to overdose, her dissimulation to Dr. Sidell about whether she continued to feel suicidal, and Dr. Sidell's opinion that there was a definite threat that she would attempt suicide, we conclude that the trial court's determination that B.D. presented a substantial risk of harm to herself was supported by the evidence.

[16] B.D. argues that she merely expressed suicidal ideation and exhibited anti-social activity, we have never affirmed the temporary commitment of someone under those circumstances, and that an affirmance of the trial court's Order would have a chilling effect for reporting suicidal ideation. However, B.D. overlooks evidence in the record that she not only reported having suicidal ideation on multiple occasions spanning a number of days, but she also expressed a plan to harm herself by overdosing on medication, so our decision is not based merely on a single instance of suicidal ideation or anti-social behavior being reported to a hotline. B.D. also contends that Dr. Sidell's opinion that there was a definite threat that she would attempt suicide was mere speculation and that the trial court was required to base its decision on her condition at the time of the commitment hearing. However, "a trial court is not

required to wait until harm has nearly or actually occurred before determining that an individual poses a substantial risk of harm . . . " *Civil Commitment of J.B. v. Community Hosp. North*, 88 N.E.3d 792, 796 (Ind. Ct. App. 2017) (quotation omitted). IU Health was not required to show a certainty that B.D. would attempt suicide. It was only required to show that B.D. posed a "substantial risk" of harm to herself which it accomplished through Dr. Sidell's opinion testimony, which included his assessment that B.D. continued to pose a threat to herself. I.C. § 12-7-2-53. Accordingly, we conclude that the trial court's determination was supported by clear and convincing evidence. *See P.B.*, 90 N.E.3d at 1202.

### III. *Forced-Medication Order*

[17]     B.D. also contends that the trial court's Order allowing IU Health to administer her Abilify injections was not supported by clear and convincing evidence. In *In re Mental Commitment of M.P.*, 510 N.E.2d 645 (Ind. 1987), our supreme court recognized that "[a] psychiatrist charged with treating a mentally ill patient must necessarily use his professional judgment in determining what he believes to be the preferred course of treatment. He must also be aware that he has an obligation to protect the patient from self-inflicted harm and to prevent him from harming others." *Id.* at 646. The court also recognized that "the patient has a liberty interest in remaining free of unwarranted intrusions into his physical person and his mind while within an institution." *Id.*

[18]     To balance these competing, important interests, our supreme court held that, in order to override a patient's will regarding the administration of medication, the healthcare provider must show

> 1) a current and individual medical assessment of the patient's condition has been made; 2) that it resulted in the honest belief of the psychiatrist that the medications will be of substantial benefit in treating the condition suffered, and not just in controlling the behavior of the individual; 3) and that the probable benefits from the proposed treatment outweigh the risk of harm to, and personal concerns of, the patient. At the hearing, the testimony of the psychiatrist responsible for the treatment of the individual requesting review must be presented and the patient may present contrary expertise.

> Equally basic to court sanctionable forced medications are the following three limiting elements. First, the court must determine that there has been an evaluation of each and every other form of treatment and that each and every alternative form of treatment has been specifically rejected. It must be plain that there exists no less restrictive alternative treatment and that the treatment selected is reasonable and is the one which restricts the patient's liberty the least degree possible. Inherent in this standard is the possibility that, due to the patient's objection, there may be no reasonable treatment available. This possibility is acceptable. The duty to provide treatment does not extend beyond reasonable methods. Second, the court must look to the cause of the commitment. Some handicapped persons cannot have their capacities increased by anti-psychotic medication. The drug therapy must be within the reasonable contemplation of the committing decree. And thirdly, the indefinite administration of these medications is not permissible. Many of these drugs have little or no curative value and their dangerousness increases with the period of ingestion. The court must curtail the time period within which they may be administered. If a patient does not

substantially benefit from the medication, it should no longer be administered.

*Id*. at 647-48.

[19] On appeal, B.D. does not appear to challenge the evidence supporting the three positive showings IU Health was required to make, namely that a current assessment had been made, Dr. Sidell's honest belief that Abilify would treat B.D.'s Bipolar Disorder and not just control its symptoms, and that Abilify's probable benefits outweighed its risks. Rather, B.D. contends that IU Health did not make an adequate showing of the limiting guidelines outlined in *M.P.*

[20] As to the first limiting factor, B.D. argues that there was no evidence that Dr. Sidell considered any other form of treatment apart from psychotropic medication or that each and every other form of treatment had been considered and specifically rejected. However, Dr. Sidell was aware of B.D.'s non-compliance with the oral Abilify she had been prescribed upon release from Methodist Hospital, he considered and rejected the alternate medications Invega and Adderall, and he testified at the hearing that he had considered lesser-restrictive alternative treatment options. The trial court could have reasonably concluded from this evidence that Dr. Sidell had considered, but rejected, all reasonable lesser-restrictive forms of treatment. Though she contends other options could have been deployed such as therapy or continued contact with Positive Link, B.D.'s argument in this regard asks that we reweigh the evidence and consider evidence that does not support the trial court's Order, in contravention of our standard of review. *See P.B.*, 90 N.E.3d at 1202.

[21]     IU Health also made an adequate showing of the other limiting guidelines set out in *M.P.* As to the requirement that the proposed drug therapy be reasonably contemplated by the commitment order, B.D. was admitted for treatment due to suicidal ideation and having claimed to have overdosed on medication. The trial court found that B.D. was a danger to herself based on the continued threat that she would commit suicide. Dr. Sidell testified that B.D.'s anger and agitation were hallmarks of her Bipolar Disorder that increased her likelihood of impulsive suicidal action. Abilify is a mood stabilizer that would mitigate the extremes of her Bipolar Disorder. Thus, the treatment plan of Abilify injections was directly related to the reasons for the commitment. Lastly, contrary to B.D.'s assertion on appeal, we need not reverse the medication order for lack of any explicitly expressed time limit. The medication order was part of the ninety-day temporary commitment order and so had an inherent, innate limit. The trial court also limited the medication order by specifying that IU Health could treat B.D. with Abilify unless she did not specifically benefit from the medication. As such, we conclude that the trial court's medication order was supported by clear and convincing evidence and leave it undisturbed.

## CONCLUSION

[22]     Based on the forgoing, we conclude that the trial court's Order finding that B.D. was a danger to herself and authorizing IU Health to medicate B.D. was supported by clear and convincing evidence.

[23]     Affirmed.

Kirsch, J. and Robb, J. concur