

FILED

Aug 08 2023, 9:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jan B. Berg
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re Commitment of:

S.C.,

*Appellant-Respondent,*

v.

Richmond State Hospital,

*Appellee-Petitioner*

August 8, 2023

Court of Appeals Case No.
22A-MH-3071

Appeal from the Marion Superior
Court

The Honorable Steven E.
Eichholtz, Judge

Trial Court Cause No.
49D08-2108-MH-025945

**Opinion by Judge May**
Chief Judge Altice and Judge Foley concur.

**May, Judge.**

[1]     S.C. appeals the trial court's denial of his petition to discontinue his regular

commitment to Richmond State Hospital ("Richmond").  S.C. argues there was

insufficient evidence to support his continued involuntary commitment. We affirm.

## Facts and Procedural History

S.C. is a twenty-three-year-old man who has been diagnosed with schizoaffective disorder and experiences auditory and visual hallucinations. On August 2, 2021, Sandra Eskenazi Mental Health Center ("Eskenazi") filed a petition for the involuntary commitment of S.C. The petition stated that S.C. was diagnosed with schizophrenia, was a risk to himself, and had "frequent suicidal thoughts – feeling a need to commit suicide." (App. Vol. 2 at 19.) On August 5, 2021, the trial court held an evidentiary hearing to determine if S.C. should be committed. The trial court issued an order of temporary commitment the same day, committing S.C. to Eskenazi until November 3, 2021. The order required S.C. to take all medications as prescribed, attend all clinic sessions as scheduled, and maintain his contact information with the trial court and designated facility.

On September 29, 2021, Eskenazi requested indefinite or regular commitment of S.C. because S.C. "continue[d] to refuse treatment at times and declin[ed] medications, [and] exhibit[ed] impulsivity, with poor to no insight into his illness." (*Id*. at 53.) On October 21, 2021, the trial court held an evidentiary hearing to review the request for regular commitment. The trial court issued an

order of regular commitment the same day, after finding S.C. was dangerous to himself,[1] dangerous to others,[2] and gravely disabled.[3]

[4] Eskenazi transferred S.C. to the Neuro Diagnostic Institute ("NDI") on January 31, 2022. NDI diagnosed S.C. with schizoaffective disorder – depressive type and cannabis use disorder. NDI attempted to discontinue one of S.C.'s medications "given the minimal amount of evidence for its use." (*Id.* at 86.) However, after missing only two doses of that medication, S.C. "became violent and physically assaulted a female nurse by punching her in the face. He lacked remorse for this event" and warned "that he was not afraid to hit a woman now or in the future." (*Id.*)

[5] NDI transferred S.C. to Richmond on October 3, 2022. NDI filed a Periodic Report on October 11, 2022, that indicated S.C. had "Schizoaffective disorder-depressive type and Cannabis Use Disorder, in early remission in a controlled environment." (*Id.* at 87.) The report also stated:

> [S.C.] presents a danger to others due to the nature of his command auditory hallucinations and his oppositional nature. He has struck staff causing a concussion and showed no remorse for doing so. He has engaged in physical altercations with peers while at NDI on at least one other occasion. He has chronic [suicidal ideation] thoughts related to the level of his command [auditory hallucinations] and has often verbalized that he

---

[1] *See* Ind. Code § 12-7-2-53 (defining dangerous to self).

[2] *See* Ind. Code § 12-7-2-53 (defining dangerous to others).

[3] *See* Ind. Code § 12-7-2-96 (defining gravely disabled).

believes that staff have a duty/obligation to kill him. When these thoughts occur, [S.C.] tries to avoid taking his medication, which makes his [auditory hallucinations] and command hallucinations worse and in the past has led to his attempts to get law enforcement to engage in a suicide by cop scenario. He is gravely disabled and is unable to provide for his own food, clothing, shelter, or other basic human needs. He currently has legal charges and is unable to drive a vehicle at this time. He has a significant history of medication non-adherence while in the community. This perpetuates his ability [sic] to maintain a stable arrangement of housing, transportation and continued adherence to medications/medical appointments.

(*Id*. at 87.) In addition, the report recommended S.C. be kept in a psychiatric facility "[d]ue to [S.C.]'s continued [auditory hallucinations and visual hallucinations], his desire to be dead, his medication non-adherence history, and his past suicide attempts[.]" (*Id*. at 88.) Moreover, NDI indicated S.C. "has poor insight and judgement into his need to stay on his medication and his need to remain hospitalized for his safety." (*Id*. at 89.) S.C. "stated on several occasions that he does not need his medication" and "he is likely to continue using cannabis products upon release." (*Id*. at 90-91.) Based on the detailed reports from NDI, on October 12, 2022, the trial court continued S.C.'s regular commitment at Richmond for another year.

[6] Soon thereafter in October, while still at Richmond, S.C. unilaterally determined he would skip doses of his anti-psychotic medication, and "it took uh several weeks for [S.C.] to get back to where he was able to have a normal conversation and was able to discuss things as he had been able to." (Tr. Vol. 2 at 8.) While off his medication, S.C. became "much more preoccupied with the

voices and was pacing the unit very angrily and responding to the voices. He was yelling out, 'Kill! Kill!' and uh later described the voices as being military hallucinations." (*Id*. at 7-8.) S.C. admitted to his psychiatrist, Dr. Robert Young, that "once he was off the commitment, he no longer had to take the medication and that was why he decided that he wanted to get off of it." (*Id*. at 8.)

[7] On October 31, 2022, S.C. filed a request for the review or dismissal of regular commitment. On November 30, 2022, the trial court held an evidentiary hearing to review S.C.'s request. At the time of the hearing, S.C.'s treatment plan included increasing his dosage to alleviate some of his symptoms. Dr. Young wanted S.C. to "stay on his current medications and . . . have his dosage gradually increased . . . to get the hallucinations under better control so he can be successful in getting out of the hospital." (*Id*. at 10.) Dr. Young testified S.C. did not appreciate the importance of his medication or of the need for him to stay on his medication and to avoid using marijuana when he leaves commitment, because S.C. "doesn't really believe that he needs medication, or that the marijuana is bad for him in any way." (*Id*.) Dr. Young opined that S.C. was dangerous to himself or others "especially if he does not take his medication or uses marijuana." (*Id*. at 9.) Dr. Young also believed S.C. could not maintain a job or provide his own essential needs if he was not medicated properly and that, even medicated, S.C. needed reminders to engage in some activities of daily living. S.C.'s case manager at Richmond testified that staff has had trouble getting S.C. out of bed in the morning and motivated to

participate in treatment. Finally, Dr. Young testified that S.C. needed to remain hospitalized because he has a high risk of non-compliance with his medication and he decompensates quickly when he stops taking the medicine.

[8] S.C. took the stand at the hearing to testify on his own behalf. S.C. indicated he "only ha[s] suicidal thoughts whenever I have hallucinations[.]" (*Id.* at 19.) His counsel asked when S.C. last had suicidal thoughts, and S.C. admitted, "Uhm, yesterday, last night." (*Id.*) S.C. testified he began hallucinating after he started taking the medication and he did not believe the medications were helping him. Instead, he asserted, "I just want to be off of medication, so I stop hallucinating." (*Id.* at 21.)

[9] That same day, the trial court continued S.C.'s regular commitment after finding that S.C. had schizoaffective disorder and cannabis use disorder; that S.C. was dangerous to himself, dangerous to others, and gravely disabled; and that commitment was "the least restrictive environment suitable for treatment and stabilization as well as protecting [S.C.] while restricting [S.C.'s] liberty to the least degree possible." (App. Vol. 2 at 12.) The trial court ordered S.C. to take all medication as prescribed, attend all clinic sessions as scheduled, maintain contact information with the court and designated facility, not harass or assault family members or others, and not use alcohol or drugs that were not prescribed by a certified medical doctor.

## Discussion and Decision

[10] "'[T]he purpose of civil commitment proceedings is dual: to protect the public and to ensure the rights of the person whose liberty is at stake.'" *Civil Commitment of T.K. v. Dep't of Veterans Affs.*, 27 N.E.3d 271, 273 (Ind. 2015) (quoting *In re Commitment of Roberts*, 723 N.E.2d 474, 476 (Ind. Ct. App. 2000)). "The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom, and given the serious stigma and adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements." *Civil Commitment of T.K.*, 27 N.E.3d at 273. To satisfy due process requirements, the facts to justify an involuntary civil commitment must be shown by clear and convincing evidence. An appellate court will affirm if, "considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find [the necessary elements] proven by clear and convincing evidence." *Bud Wolf Chevrolet, Inc. v. Robertson*, 519 N.E.2d 135, 137 (Ind. 1988).

[11] To demonstrate the propriety of an involuntary regular commitment, "[t]he petitioner is required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." Ind. Code § 12-26-2-5(e). S.C. argues the evidence before the court did not justify some of the findings entered by the court as to the elements in the first prong of the statute: mentally ill, and either dangerous or gravely disabled. We address each of his arguments in turn.

## 1. Mentally Ill

S.C. argues the evidence before the trial court was insufficient to support the trial court's finding of cannabis use disorder. However, the record clearly establishes S.C. has schizoaffective disorder that causes him to experience visual and auditory hallucinations. Accordingly, S.C. is mentally ill as required by Indiana Code section 12-26-2-5(e)(1). The finding of cannabis use disorder was superfluous, and we need not determine whether the evidence was sufficient to support it. *See Moriarty v. Moriarty*, 150 N.E.3d 616, 629 (Ind. Ct. App. 2020) (when appellate court can affirm trial court's conclusion based on validity of one ground, "we need not address her argument relating to" the other ground), *trans. denied*.

## 2. Dangerous

S.C. argues there is not clear and convincing evidence that he is dangerous to himself or others. Indiana Code section 12-7-2-53 defines "dangerous" as: "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." S.C. believes that "[e]ven when [he] was off of his medications in October he did not act in a way that was a danger to others. He didn't require restraint – chemical or physical." (Appellant's Br. at 10) (internal citations removed).

S.C. fails to acknowledge the ways his behavior changed in October 2022 when he stopped taking his medication. He became preoccupied with his hallucinations, he was unable to engage in conversations with staff, and he

paced the unit angrily while responding to the hallucinations. S.C.'s hallucinations were military in nature, and he was screaming "Kill, Kill" in the hallway. (Tr. Vol. 2 at 7.) While S.C. may not have injured anyone in October, the record contains substantial evidence that S.C. can quickly become violent toward others, as he punched a nurse in the face at NDI when he stopped a medication for only two doses. In addition, a report from Dr. Adeel Ansari at Eskenazi stated that S.C. has "admitted at least four times" that he has suicidal thoughts with a plan to harm himself, aggressive behavior, made threats to harm others, and assaulted his mother. (App. Vol. 2 at 53.) At the hearing on S.C.'s petition to terminate his commitment, S.C. testified that he had suicidal thoughts the night before the hearing. This record supported the trial court determination that S.C. remained a substantial risk of harm to himself or others.[4] *See In re Commitment of Gerke*, 696 N.E.2d 416, 421 (Ind. Ct.

---

[4] S.C. also argues there is no clear and convincing evidence that he is gravely disabled. Under Indiana Code section 12-26-2-5(e), we are required to determine whether S.C. is gravely disabled *or* dangerous. Because we already determined the trial court correctly found S.C. was dangerous, we need not determine whether the record herein would support a finding of grave disability. *See, e.g., A.S. v. Indiana University Health Bloomington Hosp.*, 148 N.E.3d 1135, 1140 (Ind. Ct. App. 2020) ("Because the statute is written in the disjunctive, a petitioner need only prove the respondent is 'either dangerous *or* gravely disabled.'" (quoting Ind. Code § 12-26-2-5(e)) (emphasis added in *A.S.*).

Nevertheless, we note that, in its closing argument before the trial court, the State argued: "Indiana Case Law is clear, Judge, that evidence of a history of noncompliance, and lack of insight, support grave disability[.]" (Tr. Vol. 2 at 29-30.) In support, the State cited *In re: the Commitment of A.M.*, 959 N.E.2d 832 (Ind. Ct. App. 2011). However, in 2015, our Indiana Supreme Court held the "denial of illness and refusal to medicate, standing alone, are insufficient to establish grave disability because they do not establish, by clear and convincing evidence, that such behavior 'results in the individual's inability to function independently.' Ind. Code § 12-7-2-96(2)." *Civil Commitment of T.K.*, 27 N.E.3d at 276. Accordingly, neither *A.M.* nor the standard by which the State encouraged the trial court to find S.C. gravely disabled are presently valid statements of Indiana law. *See P.B. v. Evansville State Hospital*, 90 N.E.3d 1199, 1203 (Ind. Ct. App. 2017) ("It is clear *A.M.* was implicitly, if not expressly, disapproved of by *T.K.*").

App. 1998) (court not required to wait for an individual to commit a physical act before determining the individual poses a substantial risk of harm).

## Conclusion

[15] The evidence in the record supported the challenged findings that S.C. is mentally ill and dangerous to himself and others.  Those findings support the trial court's continued commitment of S.C., and we accordingly affirm.

[16] Affirmed.

Altice, C.J., and Foley, J., concur.